IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **FRANCES HUDSON McCULLEY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )  **CIVIL ACTION 04-0115-WS-B** |
| | ) |
| **ALLSTATES TECHNICAL SERVICES,** | ) |
| *et al.,* | ) |
| | ) |
| **Defendants.** | ) |

**ORDER**

This matter is before the Court on no fewer than three dispositive motions, including the Motion for Summary Judgment (doc. 93) filed by defendants Allstates Technical Services, Inc. and ViaTech Services, Inc; the Motion for Summary Judgment (doc. 95) filed by defendant BE&K Engineering Company, Inc.; and the Motion for Summary Judgment (doc. 97) filed by BE&K, Inc.[1]  All three motions have been exhaustively briefed (with nearly 200 pages of briefing, plus extensive factual narratives and more than 100 exhibits, all told) and are ripe for disposition at this time.

**I.     Background.**

In February 2004, plaintiff Frances Hudson McCulley[2] initiated this action claiming that she had been subjected to multiple instances of sexual harassment and retaliation during the period spanning

---

[1]     A fifth named defendant, Jerry Hudson, has not filed a Rule 56 motion, so plaintiff's claims against him will proceed to trial irrespective of the outcome of the movants' Rule 56 filings.

[2]     The Court understands that throughout the time of the incidents complained of, plaintiff's name was Frances Hudson.  Subsequent to those incidents but prior to initiating this lawsuit, plaintiff got married, as a result of which her name became Frances Hudson McCulley.  (Complaint, ¶ 2.)  The Court further understands that sometime after filing her Complaint, plaintiff was divorced, as a result of which her name changed again to Frances Elizabeth Hudson.  (Hudson Dep., at 7.)  For the sake of clarity, and particularly given that one of the defendants also bears the last name Hudson, the Court will refer to plaintiff as "McCulley" throughout this Order.

from October 2000 through June 2002.  In her First Amended Complaint (doc. 13), plaintiff presents federal claims of sexual harassment, sex discrimination and retaliation, all presumably pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*;[3] as well as state law claims of negligence/wantonness and assault and battery.  The named defendants are Allstates Technical Services, Inc., ViaTech Services, Inc., BE&K, Inc., BE&K Engineering Company, Inc., and Jerry Hudson.

The factual underpinnings of the Complaint lie in a tangled web of allegations involving two separate alleged harassers and a host of alleged adverse employment actions.  In short, defendants ViaTech, Allstates, and BE&K Engineering are all wholly owned subsidiaries of defendant BE&K, Inc.  McCulley asserts that during her employment for ViaTech/Allstates, she was sexually harassed by a manager named Dan Dooling, who is not a party to this action.  After she complained of Dooling's conduct, McCulley asserts, ViaTech/Allstates retaliated in a variety of ways, culminating in her discharge in March 2002.  A short time later, McCulley was hired by BE&K Engineering.  Within weeks after beginning her new job, she maintains, she was subjected to pervasive sexual harassment by defendant Jerry Hudson, who was her direct supervisor.  When she complained about his conduct and rebuffed his advances, McCulley claims, she was fired in June 2002.  According to McCulley, BE&K, Inc. is legally accountable for all of this alleged wrongdoing given its status as parent company of the other defendant entities.  The factual and legal complexities in this case stem from plaintiff's contention that, in essence, lightning struck her twice, and that four different companies are legally responsible on a variety of federal and state law theories.

---

[3]     The First Amended Complaint includes apparently overlapping (and in some cases duplicative) causes of action for sex discrimination, sex harassment, hostile work environment, wrongful termination, and retaliation.  It also fails to delineate whether these discrimination/retaliation claims are rooted solely in Title VII, or whether plaintiff purports to maintain them under an alternate, state-law theory as well.  The resulting ambiguity, which serves only to obscure both plaintiff's intentions and her contentions, could have been readily averted had she outlined those claims with slightly more clarity and precision.  In summary judgment briefing, plaintiff confines her discussion of her First through Fifth Claims for Relief to Title VII; therefore, the Court assumes for purposes of this Order that those claims are brought exclusively on that basis.

The Court now confronts separate summary judgment motions from ViaTech/Allstates, BE&K Engineering, and BE&K, Inc., each of which is predicated on distinct factual averments and legal grounds. For its part, ViaTech/Allstates essentially contends that Rule 56 relief is warranted because plaintiff cannot show that the complained-of actions were retaliatory. Meanwhile, the gravamen of BE&K Engineering's motion is that plaintiff's Title VII claims are barred by the *Faragher/Ellerth* defense, the lack of any subjectively hostile work environment or actionable retaliation, and the relevant limitations period. Finally, BE&K, Inc. argues that plaintiff's Title VII claims against it are subject to dismissal because it was not her "employer" and it was not named as a respondent in her EEOC Charge.

To promote efficient resolution of the issues raised by the three sets of summary judgment filings, the Court will consider each of them in turn. Rather than presenting a detailed review of the pertinent facts distilled from the record en masse, the Court will defer discussion of those facts until reaching the crux of each motion, at which time the corresponding undisputed and disputed facts will be set forth.

## II.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-*

*Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).   However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment.   *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004).  Rather, "the summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale."  *Id.* at 1086 (citation omitted).

### III.    The ViaTech/Allstates Motion for Summary Judgment.

On its face, the First Amended Complaint appears to assert causes of action against defendants ViaTech and Allstates for sexual harassment, sex discrimination and retaliation in violation of Title VII, as well as a state-law claim for negligence/wantonness.  In response to those defendants' 27-page summary judgment brief, however, plaintiff concedes that Allstates and ViaTech are "entitled to summary judgment as to all claims with the exception of the retaliation claim."  (Plaintiff's Brief (doc. 113), at 1.)[4]  Based on McCulley's concession in this regard, the ViaTech / Allstates Motion for Summary Judgment (doc. 93) is **granted** with respect to the first, second, third, fourth, sixth and seventh claims for relief.  The Court now turns its attention to the Title VII retaliation claim that is plaintiff's fifth claim for relief, the only cause of action remaining as to defendants ViaTech and Allstates.

### A.    *Background.*[5]

---

[4]    Plaintiff's acquiescence to winnowing down the Rule 56 disputes in this action is laudable, and the Court heartily endorses her decision to capitulate as to claims that, for whatever reason, she no longer wishes to pursue against these defendants.  That said, it is unfortunate that McCulley tarried in abandoning those causes of action until after ViaTech and Allstates had devoted more than a dozen pages of their summary judgment brief to defending against those now-defunct claims.  Presumably she was aware of the infirmities in those claims prior to the close of discovery, and could have withdrawn them then.

[5]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmovant.  *See Lofton*, 358 F.3d at

Plaintiff Frances McCulley began working for defendant ViaTech Services, Inc. ("ViaTech") as a sales representative in its Mobile office on or about October 16, 2000.[6]  ViaTech is a professional recruiting/staffing company, whose core business is to provide its customers with skilled engineers and information technology professionals on a contract basis.  (Sanborn Dep., at 23.)  At all times material hereto, ViaTech was a wholly-owned subsidiary of BE&K, Inc.  (*Id.*)  In June 2002, ViaTech merged into defendant Allstates Technical Services, Inc. ("Allstates"), another wholly-owned subsidiary of BE&K, Inc.  (*Id.* at 23, 26.)  McCulley's separation from ViaTech predated the merger; nonetheless, she has named Allstates as a separate defendant herein by virtue of its status as a successor in interest to ViaTech.  For ease of reference, the Court will refer to the company for which plaintiff worked from October 2000 through March 2002 as "ViaTech," and will also refer to defendants ViaTech and Allstates collectively as "ViaTech."

> 1.      *Plaintiff's Complaints of Harassment by Dan Dooling.*

On or about June 11, 2001, McCulley availed herself of ViaTech's Employee Solutions Program ("ESP Program") by calling a 1-800 number and alleging that she had been sexually harassed. (McCulley Dep., at 75; Abrams Dep., at 86.)  At that time, McCulley complained that a ViaTech manager named Dan Dooling, a vice president of operations based in the Birmingham office, had made sexually offensive comments to her on multiple occasions over a period of several months, and groped her rear end on one occasion.  (Sanborn Dep., at 62-63; Abrams Dep., at 94.)[7]  The ESP Program

---

809; *Johnson v. Governor of State of Fla.*, 353 F.3d 1287, 1292 (11th Cir. 2003) (on summary judgment, "the district court must view all evidence in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in its favor.").  Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in her favor.

[6]      The parties agree with the veracity of this statement; however, both sides cite to an excerpt from plaintiff's deposition transcript that does not support it.  In particular, the parties' proposed Determinations of Undisputed Fact both cite to page 70 of plaintiff's deposition as supporting this fact.  But the referenced page addresses plaintiff's relocation to the Mobile area in 1995, as well as her living and schooling arrangements subsequent to that move.

[7]      In particular, McCulley reported to ViaTech management that Dooling had been very flirtatious, that he had made comments about not being faithful to his wife, that he had informed her at a

representative with whom McCulley lodged her complaints was Sharon Abrams, human resources manager at BE&K. (Abrams Dep., at 16-17, 28.)

ViaTech and Abrams proceeded to conduct an investigation of McCulley's claims. (McCulley Dep., at 75-76; Abrams Dep., at 96, 99.)[8]  Even though Dooling admitted having made a number of the alleged offensive comments, Abrams inexplicably advised ViaTech's Chief Executive Officer, Bryson Edwards, that "there's nothing I can find here" to support McCulley's charge. (Abrams Dep., at 96, 99, 115.)  Nonetheless, Edwards determined that there was sufficient corroboration of McCulley's allegations, as a result of which ViaTech requested and received Dooling's resignation on or about June 27, 2001. (*Id.* at 115, 118-19.)  The day after Dooling resigned, a ViaTech vice president conducted a company-wide conference call in which she stated that Dooling was resigning so that he could relocate and that he would be "sorely missed." (McCulley Aff., ¶ 5; McCulley Dep., at 76.)  No mention of the sexual harassment allegations was made in that conference call.

       2.    *Plaintiff's EEOC Charge.*

On November 30, 2001, McCulley filed an EEOC Charge of Discrimination in which she alleged that Dooling had sexually harassed her from October 2000 through June 2001, and that ViaTech management had retaliated against her thereafter by fabricating falsehoods about her job performance, subjecting her to unfair scrutiny, removing certain accounts from her area of responsibility, altering her sales goals, denying her salary increases and performance reviews, and otherwise subjecting

_____

Christmas party that she should not have brought a date because Dooling had big plans for her, that he had once indicated that if McCulley had come to a sales conference he "would have sent her home riding on an ice pack" (which ViaTech interpreted as meaning that he would have had sex with her so much that she would have been sore), and that he had once inquired whether she had received a haircut "on both ends". (Abrams Dep., at 94, 96, 99.)

[8]     In describing the investigation, ViaTech maintains that Abrams and Bryson Edmonds, ViaTech's Chief Executive Officer, traveled to Mobile to conduct interviews. (Defendants' Determinations of Undisputed Fact, ¶ 17.)  Once again, however, the portion of Abrams' deposition that defendants cite for this proposition lends no support to it.  The Court's task in reviewing the extensive record materials filed with the Rule 56 motions is rendered substantially more difficult when pinpoint cites to exhibits and deposition excerpts are not aligned with counsel's representations as to their contents.

her to an unstable environment.  (Defendants' Exh. 3.)  After a lengthy investigation, the EEOC entered a determination letter on October 31, 2003, finding cause for certain of McCulley's allegations, but not for others.  (Complaint, at Exh. 5).[9]

### 3.   Alleged Retaliation by ViaTech.

Plaintiff maintains that ViaTech retaliated against her for complaining about Dooling in June 2001, and for filing an EEOC Charge in November 2001 regarding Dooling's alleged behavior and alleged retaliation by ViaTech.  According to McCulley, this retaliation manifested itself in various respects as to her working conditions, and culminated in the pretextual termination of her employment in March 2002.

Setting aside her termination for the moment and focusing instead on the allegations relating to working conditions, McCulley identifies four ways in which she believes she faced retaliation.  First, she offers evidence that she was subjected to a purportedly "random" drug test on July 10, 2001, just a few weeks after complaining about Dooling.  (Plaintiff's Exh. 33.)[10]  Second, plaintiff contends that ViaTech began micromanaging her following Dooling's resignation.  In particular, ViaTech's Vice President of Sales, John Sanborn, who had been hired to replace Dooling in September 2001, began traveling from the Birmingham office to Mobile to conduct "ride alongs" with plaintiff on sales calls.  (Hudson Aff., ¶ 8.)  Sanborn did not assist McCulley with these calls, but merely sat in the car while she conducted meetings with clients or prospective clients.  (Id.)  Third, plaintiff complains that Sanborn began clandestinely monitoring her e-mail and developing an internal file for use against her.  (Bouler Dep., at

---

[9]      In one of their briefs, defendants refer derisively to this charge, stating as follows:  "Not content simply with the end of the sexual harassment, Plaintiff filed an EEOC Charge of Discrimination in November 2001."  (BE&K Engineering Brief (doc. 96), at 3.)  Defendants' suggestion that plaintiff behaved improperly or unreasonably in exercising her legal right to file an EEOC charge after experiencing alleged sexual harassment and retaliation while in defendants' employ is illuminating as to their perception of that charge and their treatment of her in the aftermath of her filing it.

[10]      The record does not reflect the outcome of that drug screening; therefore, it appears that McCulley's dissatisfaction is directed at her selection to participate in the drug test, rather than a claim that the test results were unfairly manipulated against her.

106; Plaintiff's Exh. 27.)[11]   Fourth, plaintiff alleges that ViaTech denied her a performance evaluation, pay raise, and commissions that she was due.  Specifically, McCulley offers evidence that after complaining about Dooling's behavior, she was denied pay raises that her colleagues received, she was denied commissions to which she was entitled and which other employees received, and she never received her customary performance evaluation.  (McCulley Aff., ¶¶ 9-13.)

On March 26, 2002, the day before a scheduled mediation or conciliation session in the EEOC matter, ViaTech terminated plaintiff's employment.  (Edmonds Dep., at 139, 142-44; Sanborn Dep., at 157-58.)  At the EEOC mediation, ViaTech's representative informed McCulley that she had been discharged not because of her EEOC charge, but because of a reduction in force (the "RIF").  (McCulley Aff., ¶ 16.)  ViaTech's CEO, Bryson Edmonds, had determined that a RIF was necessary because of economic downturn and sluggish sales.  (Edmonds Aff., at 2.)  Pursuant to the March 2002 RIF, ViaTech laid off 13 employees, including McCulley, from various company offices.  (*Id.*; *see also* Defendants' Exh. 22.)

**B.   Discussion.**

1.   *Legal Standard.*

In addition to prohibiting employment discrimination on the basis of gender, Title VII bars an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a); *see also Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000) ("Retaliation is a separate violation of Title VII.").[12]  Plaintiff offers no direct evidence of retaliation, but

---

[11]     Although the summary judgment record on this point is sparse, among the materials collected by Sanborn in monitoring plaintiff's conduct were file memoranda from October 2001 documenting comments she had made to her colleagues about alleged sexual harassment and certain managerial employees.  (Plaintiff's Exh. 27.)

[12]     The merits of the retaliation claim are separate and distinct from those of the underlying harassment claim.  Indeed, a plaintiff can prevail on a retaliation claim even if the underlying claim is without merit, "so long as she had a reasonable good faith belief that the discrimination existed." *Gupta*, 212 F.3d at 586 (quoting *Meeks v. Computer Assocs. Int'l.*, 15 F.3d 1013, 1021 (11th Cir.

rather grounds this cause of action exclusively on circumstantial proof.  In the absence of direct evidence, Title VII retaliation claims turn on precisely the same traditional *McDonnell Douglas* burden-shifting principles as do other Title VII claims.  *See Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002).  Thus, a plaintiff bears the burden of establishing a *prima facie* case of retaliation by showing that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal link between her protected activity and the adverse employment action.  *See Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 (11th Cir. 2003); *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002); *Bass v. Board of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1117 (11th Cir. 2001).[13]

      If a plaintiff shows a *prima facie* case, then the employer must articulate a legitimate, non-retaliatory reason for the challenged employment decision.  *See Brochu*, 304 F.3d at 1155; *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).  If the defendant produces legitimate reasons for the adverse employment action, then the plaintiff must show that defendant's stated reasons are pretextual.  *See Brochu*, 304 F.3d at 1155.  A plaintiff may establish pretext "either directly, by persuading the court that a discriminatory reason more than likely motivated the employer, or indirectly, by persuading the court that the proffered reason for the employment decision is not worthy of belief."  *Hall v. Alabama Ass'n of School Boards*, 326 F.3d 1157, 1166 (11th Cir. 2003); *see also Wilson*, 376 F.3d at 1088 (plaintiff may prevail "by either proving that intentional discrimination motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination.").  Of course, the ultimate burden rests on the plaintiff to show that the reason provided by the employer is a pretext for unlawful retaliation.  *See Pennington*, 261

---

1994)).  There is no argument or suggestion here that McCulley's internal and external complaints about Dooling were not predicated on a reasonable good faith belief that he was sexually harassing her.

      [13]    McCulley's burden of establishing a *prima facie* case is not heavy.  *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) ("the *prima facie* requirement is not an onerous one"); *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998) (plaintiff's "burden in proving a *prima facie* case is light").

F.3d at 1266; *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002).

> **2.   *Genuine Issues of Fact Preclude Summary Judgment as to Certain Working Conditions Claims.***

The Court first applies the burden-shifting standard for Title VII retaliation claims to plaintiff's four "working conditions" claims, to-wit: that ViaTech retaliated against her for complaining about Dooling and filing an EEOC charge by subjecting her to a "random" drug test, micromanaging her through managerial "ride alongs" during sales calls, secretive monitoring of her e-mail, and denying her performance reviews, raises and owed commissions.

> **a.   *Plaintiff Has Established a Prima Facie Case.***

There is not, and cannot reasonably be, any dispute that plaintiff's internal and EEOC complaints regarding the alleged sexually harassing conduct by Dooling constitute statutorily protected activity for purposes of a Title VII *prima facie* case. *See generally Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) ("Statutorily protected expression includes filing complaints with the EEOC and complaining to superiors about sexual harassment."); *Gupta*, 212 F.3d at 587 (district court correctly instructed jury that internal complaint of sexual harassment and filing of EEOC charge were activities protected by Title VII). Thus, McCulley has clearly satisfied the first prong of her *prima facie* case.

Similarly, defendants cannot and do not challenge whether denial of raises and earned commissions constitute adverse employment actions under Title VII. To be sure, "not every unkind act is sufficiently adverse" to qualify as an adverse employment action and support a retaliation claim. *Shotz*, 344 F.3d at 1181 (citation omitted). Rather, an employment action may be deemed adverse only when it "results in some tangible, negative effect on the plaintiff's employment" through "a serious and material change in the terms, conditions or privileges of employment ... as viewed by a reasonable person in the circumstances." *Id.* at 1181-82 (citations omitted); *see also Bass*, 256 F.3d at 1118 (explaining that "some threshold level of substantiality" must be satisfied for conduct to constitute an adverse employment action, inasmuch as not everything that makes employee unhappy is actionable); *Stavropoulos v. Firestone*, 361 F.3d 610, 617 (11th Cir. 2004) (no adverse employment action where complained-of conduct had no effect on plaintiff's employment status, such that it was not

objectively serious and tangible enough to be adverse employment action). The conduct of ViaTech, considered in its totality and focusing specifically on the denial of raises and commissions, unquestionably satisfies the requisite materiality threshold. *See Gupta*, 212 F.3d at 590 (opining that denial of a pay raise clearly affects plaintiff's compensation and qualifies as an adverse employment action).[14]

Finally, ViaTech does not dispute in its principal brief that the causal connection element of the *prima facie* test is satisfied as to those aspects of the retaliation claim preceding McCulley's discharge. In its reply brief, however, ViaTech asserts for the first time that there is no causal connection between plaintiff's complaints and her denial of a raise and a performance review because the intervening passage of time was too great. (ViaTech Reply Brief, at 8-9.) This assertion fails for two reasons. First, the Court declines to consider new grounds for summary judgment raised for the first time in a reply brief. Such issues are not properly before it where, as here, they could and should have been presented previously and the movant has offered no explanation for the delay.[15]

---

[14]    In arguing that no *prima facie* showing has been made, ViaTech encourages the Court to disaggregate the drug test, micromanaging, and e-mail monitoring claims from the whole and to declare that each of them is not objectively serious and tangible enough to constitute an adverse employment action. Were these three items to be examined separately and in a vacuum, each would likely flunk the substantiality threshold discussed *supra*. However, the Eleventh Circuit has cautioned against disentangling a plaintiff's varied allegations of retaliation for purposes of the adverse employment action test. *See Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998) (explaining that it is not necessary to decide whether anything less than totality of alleged reprisals would be sufficient to constitute prohibited retaliation, where the employer actions at issue, considered collectively, meet that threshold); *see also Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (even though certain complained-of acts did not rise to the level of adverse employment actions when considered individually, their total weight when considered collectively does constitute an adverse employment action); *Bass*, 256 F.3d at 1118 (similar). Given that the totality of ViaTech's conduct about which McCulley complains satisfies the "adverse employment action" element, no further inquiry into that issue is necessary in resolving the instant Rule 56 issues.

[15]    *See, e.g.*, *United States v. Gericare Medical Supply Inc.*, 2000 WL 33156443, *10 (S.D. Ala. Dec. 11, 2000) (declining to consider movant's argument in reply brief that exceeds scope of motion to dismiss, as such an argument is not properly before the court); *Martinez v. Weyerhaeuser Mortg. Co.*, 959 F. Supp. 1511, 1515 (S.D. Fla. 1996) ("the Court finds that the movant may not

Second, even if this contention were considered on the merits, it would fail. "To establish a causal connection, a plaintiff must show that the decisionmakers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Bass*, 256 F.3d at 1119 (quoting *Gupta*, 212 F.3d at 590); *Pennington*, 261 F.3d at 1266 (explaining that causal link element is construed broadly).[16] The protected activity and adverse action are not wholly unrelated if there is close temporal proximity between the two. *See id.*; *see also Cooper v. Southern Co.*, 390 F.3d 695, 740 (11th Cir. 2004) (declaring that plaintiff had established *prima facie* case of retaliation where plaintiff was fired one month after filing lawsuit). Defendants assert, without any citation to the record, that any raise or review would have been provided at or around McCulley's anniversary date of employment in mid-October 2001, or some four months after she complained internally about Dooling, and that a four-month delay is too lengthy as a matter of law to show a causal connection. Leaving aside the unsupported nature of ViaTech's assumption as to timing, this contention is fatally flawed because it ignores plaintiff's allegations that the denial of raise and review were part of an integrated series of retaliatory activity commencing within days after she lodged her sexual harassment complaint. Courts have routinely held that a causal connection exists even as to retaliatory acts occurring long after the protected activity, where those events are temporally linked by a chain of intervening retaliatory acts. *See, e.g., Bass*, 256 F.3d at 1117-19 (deeming causal connection element satisfied even though alleged retaliatory transfer occurred more than one year after EEOC charge, where retaliatory employment actions began shortly after plaintiff filed charge); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998) (causal connection requirement satisfied where

---

raise new arguments in a reply brief"); *United States v. Feinberg*, 89 F.3d 333, 341 (7th Cir. 1996) ("The reply brief is not the appropriate vehicle for presenting new arguments or legal theories to the court.").

[16]     There is no suggestion here that the ViaTech authorities who allegedly took these adverse actions against McCulley were not fully apprised of her internal and external complaints of sexual harassment. Therefore, this element of the *prima facie* case turns on the "wholly unrelated" criterion. *Compare Brochu*, 304 F.3d at 1156 (coincidence in timing is not sufficient to show causality where unrebutted testimony was that supervisor lacked knowledge of protected activity and therefore could not have retaliated against employee for it).

-12-

"the series of adverse employment actions commenced almost immediately after management learned she had filed the charge"); *Gupta*, 212 F.3d at 590 (causal connection shown even though alleged retaliation occurred as late as a year after plaintiff filed suit). Therefore, the Court concludes that the causal connection requirement is satisfied, and that McCulley has satisfied her *prima facie* burden.[17]

> **b.     *ViaTech Has Identified Legitimate Reasons for Certain of the Alleged Retaliatory Acts.***

McCulley having successfully made her *prima facie* showing, the burden shifts to ViaTech to "offer legitimate, nondiscriminatory reasons for the employment action to rebut the presumption" of retaliation. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998); *see also Brochu*, 304 F.3d at 1155. ViaTech has proffered substantial evidence to satisfy its burden of production as to several of these alleged retaliatory acts, but not as to others.

Regarding the drug test, the record reflects that plaintiff was selected for a purportedly "random" drug test on or about July 11, 2001. (Plaintiff's Exh. 33.)[18] At the outset of her employment,

---

[17]     To adopt ViaTech's argument would be to hold that any retaliatory act for protected activity is not proscribed by Title VII so long as an employer waits three or four months before implementing it, even if a series of lesser retaliatory acts commenced much earlier. Such a rule would subvert the remedial purposes of Title VII's retaliation provision. Moreover, the Eleventh Circuit's rulings in *Wascura v. City of South Miami*, 257 F.3d 1238 (11th Cir. 2001) and *Higdon v. Jackson*, 393 F.3d 1211 (11th Cir. 2004), upon which ViaTech relies heavily in its causal connection argument on page 8 of its reply brief, are distinguishable. Both the *Wascura* and *Higdon* courts found that intervals of three to four months between the protected activity and the alleged reprisal were not sufficient, in and of themselves, to prove a causal connection. *See Wascura*, 257 F.3d at 1248; *Higdon*, 393 F.3d at 1221. Here, by contrast, the causal connection stems not solely from the proximity in time between sexual harassment complaint and plaintiff's discharge, but also from the chain of allegedly retaliatory activities commencing almost immediately after McCulley complained about Dooling.

[18]     The drug screening form is one of many unauthenticated exhibits that both sides have submitted in support of their respective positions on summary judgment. Generally, courts ruling on Rule 56 motions may consider only admissible evidence. *See Denney v. City of Albany,* 247 F.3d 1172, 1189 n.10 (11th Cir. 2001) ("In considering a summary judgment motion, a court may only consider evidence that is admissible or that could be presented in an admissible form.") (citation omitted). Documents must generally be properly authenticated to be considered at summary judgment, unless it is apparent that they can be reduced to admissible, authenticated form at trial. *See Bozeman*

plaintiff acknowledged that ViaTech might require her to submit to a random drug screening at any time. (Defendants' Exh. 20.)  Moreover, the uncontroverted evidence is that ViaTech conducted random drug screens every 60 days between early 2001 and the middle of 2002, with a third-party testing agency called Kroll Laboratory randomly selecting numbers corresponding to particular employees chosen for testing.  (Jacobs Dep., at 11-13, 15.)  Defendants' evidence is that on July 10, 2001, Kroll picked employees assigned numbers 4, 9 and 24 from among ViaTech's 52 employees for random drug tests, and that McCulley had been assigned one of those numbers.  (Defendants' Exh. 19.) ViaTech's burden of production is satisfied.

Regarding McCulley's complaint of "micromanagement," ViaTech presents evidence that company CEO Bryson Edmonds specifically directed Sanborn "to spend time in each of the branches with the salespeople on calls to do everything as an organization to improve our sales."  (Edmonds Dep., at 70.)[19]  According to Edmonds, having Sanborn "ride along" with McCulley and other sales representatives "was an important part of his responsibility" at ViaTech.  (*Id.* at 72.)  Sanborn testified that, in addition to riding along with McCulley on sales calls, he traveled to the company's Houston, Texas branch, where he did "the same thing" with the sales force at that office that he did with McCulley in the Mobile office.  (Sanborn Dep., at 156-57.)  Such evidence plainly meets ViaTech's burden of production.

Plaintiff also contends that ViaTech retaliated against her by clandestinely reviewing her e-mail and developing an internal file with adverse information about her.  In response to allegations that she

---

*v. Orum*, 199 F. Supp.2d 1216, 1222 (M.D. Ala. 2002).  Those requirements were not followed as to the drug screening form, or numerous other exhibits to the parties' filings.  Nonetheless, no party having objected to the authenticity of these items, there appears to be no dispute that the proffered exhibits are in fact true copies of the documents at issue.  Because it is apparent that these materials can be reduced to admissible, authenticated form at trial, the Court will consider them on summary judgment. Nonetheless, a far better practice would have been for the litigants to authenticate (via affidavit or otherwise) the exhibits on which they rely for summary judgment purposes.

[19]     Edmonds testified that he issued this extraordinary edict because he was concerned that ViaTech's business was becoming more competitive, as a result of which he placed greater emphasis on management attention to the sales process than had previously been done.  (Edmonds Dep., at 69-70.)

was singled out for adverse scrutiny in this regard, ViaTech presents no evidence either rebutting plaintiff's contention or explaining its actions. ViaTech does not contend that other employees' e-mail was monitored to the same extent as plaintiff's or that Sanborn was developing internal files as to other employees akin to that for McCulley. Rather, the totality of defendants' response to this allegation is a conclusory statement that an employer "may take reasonable measures to defend an EEOC charge." (Reply Brief, at 10.) Such a statement may be a correct summation of law, but ViaTech fails to apply it to this case by offering any evidence that this was in fact the reason motivating its behavior. Absent any evidence that others were monitored, or explaining why ViaTech singled McCulley out for monitoring after her internal and external complaints, defendants have failed to satisfy their burden of production. Mere contentions not backed by evidence are manifestly insufficient. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 & n.9, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) ("an articulation not admitted into evidence will not suffice" and "the defendant cannot meet its burden merely ... by argument of counsel"); *IMPACT v. Firestone*, 893 F.2d 1189, 1193 (11th Cir. 1990) (reversing lower court's finding that defendants satisfied burden of production where they merely contended that person believed to be most qualified was hired). ViaTech's motion for summary judgment is therefore **denied** as to the monitoring claim.

Plaintiff also maintains that ViaTech's failure to provide her with a "customary" performance evaluation at or near her anniversary date of employment was retaliatory. (McCulley Aff., ¶ 12.) ViaTech offers a legitimate nonretaliatory reason for this omission, to-wit: the company lacked an official process for annual performance evaluations of its employees, it did not have a practice of performing such evaluations, and Sanborn simply did not complete formal evaluations for any of his subordinates. (Sanborn Dep., at 143, 151; Edmonds Dep., at 56-57.) In this regard, Sanborn testified that he had no recollection of preparing a formal evaluation on Doug Bounds, who was the Mobile office's recruiter and plaintiff's peer, during the time period at issue. (*Id.* at 144.) Such evidence is clearly sufficient to satisfy defendant's burden of production.

Next, plaintiff contends that the company's failure to give her a pay raise in the aftermath of her sexual harassment complaints was retaliatory. (McCulley Aff., ¶ 12.) ViaTech seeks to explain its

-15-

denial of a raise to McCulley by reference to an alleged salary freeze.  On April 27, 2001, Edmonds sent a letter to all ViaTech employees explaining that the broad economic slowdown in the United States had detrimentally impacted the staffing industry, including specifically ViaTech's customers and business prospects.  In light of these considerations, the letter stressed the need to reduce costs.  As a means to that end, the letter announced that Edmonds had "issued a company-wide hiring and salary freeze."  (Plaintiff's Exh. 44.)[20]  The letter does not define or delineate the scope of such a freeze, nor does it identify what (if any) exceptions ViaTech might consider.  Certainly, the existence of a salary freeze is a legitimate nonretaliatory reason for ViaTech's denial of a pay increase to McCulley, and is therefore sufficient to meet its burden of production.

Finally, McCulley maintains that she was retaliated against with regard to commissions.  In particular, she cites a sales promotion called "Operation Easy Money," through which she was entitled to certain commissions.  (McCulley Aff., ¶ 10; Plaintiff's Exh. 46.)  She was never paid such commissions.  (McCulley Aff., ¶ 10.)  By contrast, Doug Bounds, the Mobile office recruiter, received nearly $1,900 in commissions through that sales contest.  (*Id.*; Plaintiff's Exh. 42.)  In response, ViaTech simply argues that plaintiff has not proven how she was entitled to such commissions, the amount of such commissions, the time frame, or the identity of the decisionmaker.  (Reply Brief (doc. 116), at 7-8.)[21]  The fundamental defect with defendants' strategy is that it flies in the face of the *McDonnell Douglas* burden-shifting scheme.  Plaintiff has clearly made a *prima facie* showing of retaliation.  Therefore, it is incumbent on defendants to articulate a legitimate, non-retaliatory reason

---

[20]    Plaintiff's opposition brief argues at length that Edmonds' wage-freeze letter was actually dated March 27, 2002, or the day after McCulley's discharge.  (Plaintiff's Brief (doc. 113), at 4, 11.)  This perplexing assertion is directly contradicted by the face of the letter itself, which plaintiff attaches as Exhibit 44.  The Court is at a loss to understand plaintiff's insistence that a letter dated April 27, 2001 was actually dated March 27, 2002.  Absent any evidence to support plaintiff's position on this point, the Court assumes that Edmonds' letter was sent to ViaTech employees on the April 27, 2001 date reflected on the letter, and not 11 months later.

[21]    Defendants' point as to time frame is incorrect, as plaintiff submitted a memorandum showing that the Operation Easy Money contest ran from approximately December 2001 through February 2002, the three-month period immediately after McCulley's filing of an EEOC charge alleging sexual harassment and retaliation.  (Plaintiff's Exh. 46.)

why she was not paid Operation Easy Money commissions.  Rather than doing so, ViaTech skips

ahead to the ultimate question of whether McCulley has adequately proven her case.  A defendant does

not satisfy its burden of production by simply criticizing the sufficiency of the plaintiff's showing.[22]  After

review of the briefs, the Court is left with no inkling of what ViaTech might state is the reason why it did

not pay those commissions to plaintiff.  Accordingly, ViaTech has utterly failed to satisfy its burden of

production, and its request for summary judgment as to the commissions issue is **denied**.[23]

> c.    *Genuine Issues of Fact Exist as to Pretext for the Drug Testing,*
> *Raise and Commission Claims.*

ViaTech having met its burden of production as to the drug testing, micromanagement,

performance evaluation, and raise issues, the burden shifts back to McCulley to show that the

defendants' stated reasons for the challenged actions are pretextual.  As previously noted, a plaintiff

may satisfy her pretext burden either through direct evidence that a discriminatory reason likely

motivated the employer, or through indirect evidence that the proffered reason for the challenged action

is unworthy of belief.  *See Hall v. Alabama Ass'n of School Boards*, 326 F.3d 1157, 1166 (11th Cir.

2003); *see also Wilson*, 376 F.3d at 1088.  In this case, McCulley has chosen the latter option.

---

[22]     Of course, ViaTech's burden of articulating legitimate, nondiscriminatory reasons for its
employment decision is one of production only, and it "need not persuade the court that it was actually
motivated by the proffered reasons."  *Israel v. Sonic-Montgomery FLM, Inc.*, 231 F. Supp.2d 1156,
1160 (M.D. Ala. 2002) (quoting *Chapman v. AI Transport*, 229 F.3d 1012 (11th Cir. 2000)).
Nonetheless, it is incumbent on ViaTech to produce evidence of a legitimate, nondiscriminatory reason
for not paying commissions to McCulley.  *See Burdine*, 450 U.S. at 254-55 (to raise genuine issue of
fact, defendant "must clearly set forth, through the introduction of admissible evidence, the reasons for"
the challenged decision).  ViaTech has not done so.

[23]     Defendants' failure to meet their burden of production on the commissions issue is
fortuitous for McCulley.  In an attempt to show pretext on that claim, McCulley asserts that on pages
169 and 170 of his deposition, Sanborn testified that plaintiff was entitled to easy money commissions
and that he was aware of no reason why she did not receive them.  (Opposition Brief, at 10.)  The
problem is that plaintiff neglected to include pages 169 and 170 to her evidentiary submission, so the
cited pages are not part of the Rule 56 record and plaintiff's counsel effectively asks the Court to take
his word for it.  Of course, this omission is a moot point, given ViaTech's failure to propound a
legitimate nonretaliatory explanation for the challenged action or to satisfy its Rule 56 burden of
production.

-17-

Where, as here, a plaintiff seeks to discredit the employer's proffered explanation, she must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find [all of those reasons] unworthy of credence." *Watkins v. Sverdrup Technology, Inc.*, 153 F.3d 1308, 1314 (11th Cir. 1998) (citation omitted).  In conducting the pretext analysis, the Court is careful to avoid second-guessing the employer's reasoning, so long as the asserted reason is one that might motivate a reasonable employer.  *See Pennington*, 261 F.3d at 1267.

On the drug testing issue, plaintiff does not directly challenge ViaTech's evidence about the randomness of the selection process.  Nonetheless, McCulley suggests that sufficient evidence of pretext may be derived from the following facts: (1) plaintiff was drug tested just a month after reporting Dooling for sexual harassment; (2) Doug Bounds (the principal corroborating witness for plaintiff as to the Dooling allegations) was also tested for drugs at the same time;[24] and (3) only 3 of ViaTech's 52 employees were subjected to "random" drug screens in July 2001.  (Opposition Brief, at 2, 9.)  The Court agrees that the suspect timing of the drug screens and the fact that two of the three employees chosen company-wide for testing were protagonists in the Dooling complaint raise an inference of implausibility as to ViaTech's insistence that the selection process was totally random and controlled by a third party.[25]  On that basis, the Court concludes that McCulley has satisfied her pretext burden and that genuine issues of fact preclude the granting of summary judgment on the drug testing issue.

---

[24]     To counter this allegation, ViaTech submits an affidavit from Bounds with its reply brief. Bounds states that he has been assured by Edmonds that his selection for a drug screen in July 2001 was not retaliatory, and that those representations are good enough for him.  (Bounds Aff., at 3.) Nonetheless, Bounds also testifies that he initially felt that his selection for the "random" test was "perhaps grounded in [his] support for" McCulley in the Dooling matter.  (*Id.*)  That ViaTech's assurances assuaged his concerns does not necessarily imply that they must do the same for a jury.

[25]     Indeed, probability theory tells us that the likelihood of plaintiff being selected randomly for drug testing in July 2001 was just 3/52, or less than 6%.  The odds of both plaintiff <u>and</u> Bounds being selected randomly at that time were 3/52 times 2/51, or 0.23%, or roughly 434:1.  It is certainly not impossible that both of them could have been selected randomly, but the odds of such an occurrence happening totally at random (without manipulation of the randomization protocol) are vanishingly small.  That fact alone is sufficient evidence of pretext to allow McCulley to reach a jury.

-18-

ViaTech's motion is **denied** as to the July 2001 drug test.

With regard to the micromanagement, plaintiff's opposition brief offers no evidence that Sanborn's "ride alongs" with her were in any way retaliatory.  She does not cast any doubt on ViaTech's evidence that Sanborn engaged in such ride alongs pursuant to a renewed company focus on management and sales.  Moreover, McCulley does not counter evidence that Sanborn engaged in identical supervisory activities with all of his sales representative subordinates, not just McCulley, and that she was treated no differently than her Houston colleagues in that regard.  There being no evidence from which a reasonable factfinder could conclude that plaintiff was singled out for micromanagement by Sanborn or that ViaTech's stated reasons for "ride alongs" were pretextual, plaintiff has failed to satisfy her burden as to that claim.  Accordingly, ViaTech's motion for summary judgment is **granted** with respect to plaintiff's retaliation claim predicated on micromanagement.

On the performance evaluation front, ViaTech explained that the company had no policy or practice of conducting regular evaluations and that Sanborn's practice was not to prepare formal evaluations of any of his subordinates during the time period at issue.  In an attempt to undermine that explanation, McCulley argues that Doug Bounds (who was also supervised by Sanborn) did receive a performance review.  (Opposition Brief, at 3.)  There is no evidence to support this contention; rather, plaintiff relies solely on the unvarnished representations of her attorney.[26]  Of course, unsupported representations of counsel are not evidence that may be considered on a motion for summary judgment. *See, e.g., Nieves v. University of Puerto Rico*, 7 F.3d 270, 276 (1st Cir. 1993) ("Factual assertions by counsel in motion papers, memoranda, briefs, or other such 'self-serving' documents, are generally insufficient to establish the existence of a genuine issue of material fact at summary judgment."); *Jordan v. Warehouse Services, Inc.*, 81 F. Supp.2d 1257, 1263 n.10 (M.D. Ala. 2000) (unsworn statement

---

[26]     To be sure, plaintiff's brief cites to the Affidavit of Frances McCulley in support of this proposition.  (Opposition Brief, at 3.)  But that Affidavit contains no assertion that Bounds ever received a formal evaluation; to the contrary, after complaining that plaintiff had received neither an evaluation or a raise, the McCulley Affidavit states that "Doug Bounds had received a pay raise," with no mention of an evaluation.  (McCulley Aff., ¶ 12.)  For that reason, the cited evidence cannot bolster plaintiff's pretext argument.

of counsel is not evidence and cannot be considered in evaluating motion for summary judgment); *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, 124 F. Supp.2d 1228, 1236 (M.D. Ala. 2000) ("opinions, allegations, and conclusory statements of counsel do not substitute for evidence"). Because plaintiff can not surmount the pretext hurdle simply via a conclusory statement of her attorney,[27] ViaTech is entitled to summary judgment as to plaintiff's retaliation claim premised on denial of an annual performance evaluation, and the motion is **granted** on that issue.

Lastly, McCulley offers substantial evidence undercutting ViaTech's contention that the lack of a raise in late 2001 was attributable to the company's hiring/salary freeze. In particular, plaintiff presents evidence that there was no hard freeze at all. On the hiring side, company documents reflect that ViaTech hired nine new employees between July 2001 and January 2002. (Plaintiff's Exh. 49.) On the compensation side, it appears that between April 2001 and March 2002, some 20 ViaTech employees (or 40% of the company) received discretionary bonuses ranging from $500 to $15,000. (Plaintiff's Exh. 48.) Plaintiff also points to evidence that Bounds received a pay increase in July 2001, during the period of the purported salary freeze. (McCulley Aff., ¶ 12.)[28] All of this evidence strongly suggests that either the salary/hiring freeze announced by Edmonds in April 2001 had been abrogated by late 2001 and early 2002, or alternatively that the "freeze" was a malleable, flexible construct that could be molded by ViaTech management to the expediencies of the moment. Either way, McCulley's

---

[27]     Plaintiff's only other means of showing pretext on the evaluation point is to argue that ViaTech has adopted inconsistent positions. (Opposition Brief, at 4.) Plaintiff points out that ViaTech informed the EEOC that its managers had "let performance reviews slide due to the fact that there is a company salary freeze in effect" (Plaintiff's Exh. 17), while Sanborn testified that his failure to evaluate subordinates was not the product of a salary freeze. (Sanborn Dep., at 151.) This discrepancy is immaterial because the uncontroverted fact is that, whatever the reason, Sanborn did not complete performance evaluations for <u>any</u> of his subordinates. Because McCulley was in no way singled out in this respect, Sanborn's failure to evaluate her could not possibly have been retaliatory.

[28]     This fact runs directly counter to defendants' representation to the EEOC that "[l]eaving aside the fact that no one is entitled to a salary increase at any time, [plaintiff] (and our other employees) has not received one because there has been a company-wide salary freeze in effect." (Plaintiff's Exh. 17.) Bounds' experience is proof that "other employees" in fact did receive salary increases during the relevant time period, casting considerable doubt on the legitimacy of defendants' stated explanation for not increasing McCulley's pay.

-20-

evidence casts considerable doubt on the veracity of the "freeze" as an explanation for ViaTech's failure to give her a raise. Defendants' Rule 56 Motion is therefore **denied** as to the raise claim.[29]

In sum, then, ViaTech's Motion for Summary Judgment is **granted** as to the micromanagement and evaluation claims, but is **denied** as to all remaining "working conditions" claims, including the drug testing, monitoring, commission and raise claims.

>     *3.      Genuine Issues of Fact Preclude Summary Judgment as to the Termination Claim.*

ViaTech fired McCulley on March 26, 2002, ostensibly pursuant to a reduction in force ("RIF"). The centerpiece of plaintiff's Title VII retaliation claim against ViaTech is her contention that her discharge (coming just one day before a scheduled EEOC mediation/ conciliation session) was in retaliation for her complaints against Dooling and her EEOC charge against the company. This claim is subject to precisely the same burden-shifting analysis described *supra*.

With respect to the *prima facie* case, ViaTech does not dispute that McCulley engaged in a statutorily protected activity or that an adverse employment action occurred. (Defendants' Brief, at 21.) Rather, defendants' sole objection to plaintiff's *prima facie* showing concerns the third element, namely the causal link between her protected activity and the adverse action. Defendants argue that the passage of four months between plaintiff's filing of an EEOC charge and her termination destroys any causal nexus between the two events. (*Id.*) The Court has already rejected this contention, *supra*,

---

[29]      In a futile effort to secure summary judgment, ViaTech attempts to rebut plaintiff's evidence in two respects. First, ViaTech shows that Bounds' raise was associated with his promotion to the position of Senior Recruiter / Office Manager in August 2001. (Defendants' Exh. 45; Bounds Aff., at 4.) But this evidence does not help ViaTech. It matters not whether Bounds is a comparator who is similarly situated to plaintiff in all respects. ViaTech has argued in its summary judgment filings that McCulley did not receive a raise because there was a salary/hiring freeze. But the fact remains that, for whatever reason, ViaTech did not honor the freeze with respect to Bounds, which in turn supports an inference that the freeze itself was illusory or pretextual. Second, ViaTech insists that McCulley was not "entitled" to a raise, in any event. (Reply Brief, at 9.) But this argument is a *non sequitur*. ViaTech's stated reason for not giving her a raise is not that she did not deserve one, but that a freeze prevented the company from awarding her a raise. It is therefore an illogical shell game for ViaTech to fault McCulley's pretext showing for not proving her "entitlement" to a raise, when defendant has never suggested that she would have been denied a raise absent the freeze.

based on the intervening sequence of allegedly retaliatory events linking the internal and external complaints to plaintiff's ultimate discharge.  Because plaintiff has presented evidence of a continuing course of retaliatory conduct extending from June 2001 through March 2002, she has made a sufficient showing of a causal link to establish her *prima facie* case of retaliatory discharge.

To shoulder its burden of presenting a legitimate nonretaliatory reason for her dismissal, ViaTech presents substantial evidence demonstrating the *bona fide* nature of the RIF.  For the fiscal year ending March 31, 2002, ViaTech was not profitable, the first and only year that it had ever lost money.  (Edmonds Dep., at 21-22.)  In light of the economic downturn and in order to restore the company to profitability, Edmonds decided to implement a reduction in force in March 2002.  (*Id.* at 20-21; Sanborn Dep., at 160; Defendants' Exh. 18, at 2.)  As a result of that decision, ViaTech laid off 13 employees in late March 2002.  (Defendants' Exh. 18, at 2; Defendants' Exh. 21, 22.)  Plaintiff was among the employees selected for RIF.  In its brief, ViaTech states without elaboration that McCulley was selected for layoff "based upon the company's assessment of her job performance and her potential" as a salesperson and "due to her job performance."  (Defendants' Brief, at 2, 23.)

Plaintiff does not question the legitimacy of ViaTech's RIF; however, she does challenge her selection for same, and points out inconsistencies in the record that raise an inference of pretext.[30] Although ViaTech insists that McCulley was selected for layoff based on job performance and potential, a ViaTech ranking of ten salespersons shows that she was not the lowest-ranked employee on those metrics.  Indeed, while ViaTech rated McCulley a score of 3 out of 10 for both current and future capability, another sales employee named Holly Charles scored a 1 out of 10 in each category. (Plaintiff's Exh. 50.)  Yet Charles was not selected for the RIF.  (Plaintiff's Exh. 45.)  Moreover, the

---

[30]     The Court rejects defendants' contention that plaintiff cannot possibly show pretext because Edmonds had handled the Dooling issue in a satisfactory and responsible manner, and that he therefore could not have retaliated against her.  (Reply Brief, at 12.)  That an employer removes a harasser when a sexual harassment claim is made does not insulate that employer from liability as a matter of law if it proceeds to take adverse action against the complaining party because of her complaint.  ViaTech is free to argue to the jury that Edmonds' disposition of the Dooling matter is inconsistent with an intent to retaliate, but this argument cannot prevail on summary judgment given that other, contrary inferences may reasonably be drawn from the evidence.

company's present characterization of McCulley's performance conflicts with contemporaneous documentation.  In a December 5, 2001 e-mail, Sanborn heaped effusive praise on McCulley and Bounds, indicating that they had achieved "the best week any of our offices have had in some time." (Plaintiff's Exh. 9A.)  A month later, Sanborn e-mailed McCulley and Bounds that the Mobile office had demonstrated "[g]reat progress" and "huge" results, such that he thanked them "for your contributions to the growth of this business."  (*Id.*)  In an undated note, ViaTech stated that McCulley had "placed the most" business, presumably of any sales representative participating in a sales contest. (Plaintiff's Exh. 47.)  In his deposition, Sanborn testified that he was satisfied, based on his personal observations, that McCulley "was reaching out to new potential clients and doing things we wanted her to do."  (Sanborn Dep., at 140-41.)[31]  Based on this extensive evidence of favorable job performance, there are genuine issues of material fact as to whether McCulley's job performance actually warranted her selection for the RIF in March 2002.[32]

Perhaps recognizing the infirmities of their "job performance" explanation, defendants abruptly shift gears in their reply brief by arguing that the real reason for McCulley's selection was not poor performance, but was rather the fact that Mobile was not viewed "as a market with growth prospects

---

[31]     The only aspect of plaintiff's job performance with which Sanborn expressed dissatisfaction was her failure to meet company goals for numbers of sales calls.  (Sanborn Dep., at 141.)  However, Sanborn also testified that he had similar concerns with employees of the Houston branch office not meeting sales call goals.  (*Id.* at 142.)  Thus, it is clear that Sanborn's dissatisfaction with failure to meet company goals was not confined to McCulley, but was equally applicable to other sales representatives.  Despite their failure to meet the same goals that McCulley failed to meet, no sales employees in the Houston office were selected in the RIF.  (Plaintiff's Exh. 53.)  Additionally, evidence in the record strongly suggests that ViaTech was aware of the unrealistic nature of this "goal," as Bounds advised Sanborn that plaintiff's goal "should be revised downward" and that she was "lucky to get" the client meetings she did.  (Plaintiff's Exh. 9-A.)

[32]     In discussing her job performance, plaintiff's brief alleges, *inter alia*, that her sales were approximately $250,000 during the first quarter of 2002 and that the profit on her sales was at or near the highest in the company.  (Opposition Brief, at 4-5, 9.)  The exhibits cited by plaintiff for these propositions are inapposite, and the Court's review of the record does not reveal any documentation to support counsel's representations.  Because unadorned representations of counsel may not be considered on summary judgment, the Court does not rely on these allegations in reaching its conclusions herein.

for the company." (Reply Brief, at 12.) ViaTech failed to mention this ground for selecting McCulley in its initial brief.[33] The presence of such a glaring inconsistency, as ViaTech's stated reason for termination shifts with the exigencies of the situation, is itself sufficient to satisfy plaintiff's burden of showing pretext. *See Tidwell v. Carter Products*, 135 F.3d 1422, 1428 (11th Cir. 1998) (observing that "identification of inconsistencies in an employer's testimony can be evidence of pretext"); *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 284 (3rd Cir. 2001) ("[i]f a plaintiff demonstrates that the reasons given for her termination did not remain consistent, beginning at the time they were proffered and continuing throughout the proceedings, this may be viewed as evidence tending to show pretext"); *E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2nd Cir. 1994) (where there were discrepancies in defendant's explanations for plaintiff's layoff, a reasonable juror could infer that explanations were pretextual, *post hoc* rationalizations to combat evidence of discrimination); *Cichewicz v. UNOVA Indus. Automotive Systems, Inc.*, 2004 WL 291178, *4 (6th Cir. Feb. 12, 2004) ("As a number of courts have explained, evidence of pretext may consist of a defendant's changing explanations.").

Leaving aside the discrepancy, ViaTech's assertion that McCulley was laid off because of dim sales prospects in the Mobile market is not properly raised because it was articulated for the first time in its reply brief. Moreover, this explanation may be exposed as pretextual for two additional reasons. First, Sanborn testified that Mobile sales were "fairly stable" and that the Mobile office was more profitable than the Houston office, from which no salesperson was laid off. (Sanborn Dep., at 158-59.)[34] Second, and more importantly, the company's decision to lay off a person in the Mobile office

---

[33]        In their reply brief, defendants chastise plaintiff for omitting this "critical fact" in her summary judgment analysis. (Reply Brief, at 12.) However, plaintiff's omission is understandable, given that ViaTech's 27-page principal brief makes no mention of alleged soft business prospects in the Mobile market as a basis for laying off McCulley.

[34]        The Court recognizes that Sanborn also testified that ViaTech "believed that our sales prospects were much greater in the Houston market than we believed they would be in the Mobile market." (Sanborn Dep., at 159.) Contrary to defendants' argument, however, the Court cannot find that a jury would have to blindly accept this conclusory statement at face value, particularly where it clashed with Sanborn's testimony as to the present profitability of the two branches. A defendant may

sheds no light as to the reasons why McCulley was the person selected.[35]  On the inconclusive summary judgment record, the Court declines to speculate as to what those reasons might have been.

Considering all of these issues collectively, it is evident that significant material issues of fact remain as to the reasons for McCulley's termination by ViaTech on March 26, 2002, the eve of a scheduled EEOC conciliation/mediation in plaintiff's administrative proceedings.  Accordingly, defendants' motion for summary judgment as to the Title VII retaliation claim predicated on plaintiff's discharge is **denied**.

## IV.    The BE&K Engineering Motion for Summary Judgment.[36]

---

not simply invoke "business judgment" as a talismanic mechanism for deflecting all scrutiny of personnel decisions, particularly where conflicting evidence in the record raises an inference that "business judgment" is but a smokescreen for unlawful retaliation.

[35]    This concern is particularly warranted where the record reflects that McCulley was the only salesperson laid off by ViaTech in the March 2002 RIF.  (Plaintiff's Exh. 53.)  The clear majority of the layoff selectees were recruiters, and ViaTech has articulated no business reason why it deviated from that practice in the Mobile office and nowhere else.

[36]    Defendant BE&K Engineering requested and received permission to file a principal brief exceeding the 30-page limitation set forth in Local Rule 7.1(b).  As so often occurs, however, the resulting 38-page brief (excluding defendants' separately filed 22-page factual narrative) includes numerous unnecessary digressions into collateral matters, prolix block quotations, and the like.  Given the relatively straightforward legal and factual issues presented in BE&K Engineering's Rule 56 motion, the Court has every confidence that with some minor editing and deletion of its weakest arguments, defense counsel could have fully and fairly presented its arguments within the 30-page limitation of LR 7.1(b), with room to spare.  The same is true of plaintiff's 38-page opposition brief filed with leave of Court.  Equally disappointing is the inclusion in the summary judgment record of numerous redundancies, as plaintiff and defendants designate many of the same exhibits and deposition excerpts in their separate evidentiary submissions.  The result is a needlessly voluminous record, forcing the Court to waste scarce resources wading through often duplicative materials.  Furthermore, defendant compounds these unwarranted liberties by peppering its reply brief with footnotes in a microscopic font, and shrinking the lower margin to just ¾ of an inch, in order to keep its reply within the 15-page limitation.  Using such a tiny font and tampering with margins show clear intent to circumvent LR 7.1(b), and are themselves violative of the specifications of LR 5.1.  The Court expects counsel to show due regard for the letter and spirit of the Local Rules in future submissions, and to take all reasonable measures to edit its briefs to conform them to the page limitations, absent truly extraordinary circumstances that are lacking here.

A.  **Background.**

1.  *Plaintiff's Hiring by BE&K Engineering.*

Plaintiff's termination by ViaTech does not conclude this matter.  On March 27, 2002, the day after her layoff, the EEOC conciliation/mediation went forward as scheduled.  (Defendants' Exh. 5, at 2.)  At that time, a BE&K representative indicated that the company might be able to hire McCulley into a part-time job at BE&K Engineering working under defendant Jerry Hudson, Vice President and General Manager of that entity's Mobile office.  (*Id.*; McCulley Aff., ¶ 17; McCulley Dep., at 100.)  On April 8, 2002, Hudson sent a letter to McCulley offering her "employment as a Business Development Coordinator reporting to Mr. Jerry Hudson" for a "guaranteed minimum of 20 hours per week."  (Defendants' Exh. 23.)  McCulley signed the offer letter on April 15, 2002, and commenced work at BE&K Engineering immediately.  (*Id.*; McCulley Aff., ¶ 17.)[37]

2.  *The Alleged Sexual Harassment.*

During the first few weeks of McCulley's employment at BE&K Engineering, she did not experience any difficulties with Hudson, her direct supervisor.  (McCulley Aff., ¶ 19.)[38]  Beginning in

---

[37]  BE&K Engineering has included in its briefs a detailed description (including specific dollar figures) of the parties' settlement negotiations relating to the ViaTech EEOC charge, apparently for the purpose of tarring McCulley as greedy and unreasonable.  (BE&K Engineering Brief (doc. 96), at 3-4; Defendants' Exh. 34.)  Counsel are undoubtedly well aware that Rule 408, Fed.R.Evid., generally renders inadmissible any evidence of settlement offers or conduct or statements made in compromise negotiations.  Defendant having failed to articulate any basis under which the ViaTech settlement negotiation evidence could be admissible in this case, much less any reason why it is relevant to BE&K Engineering's summary judgment motion, the Court declines to consider it at this time.

[38]  There was, however, a history of adverse dealings between McCulley and Hudson dating back to fall 2001.  When McCulley worked for ViaTech, she had ongoing work-related interaction with Hudson, who was ViaTech's primary customer in Mobile.  At that time, McCulley saw Hudson on approximately a weekly basis.  (McCulley Dep., at 97-98.)  In October 2001, McCulley surreptitiously taped a conversation in which she told Hudson, "I can't handle the touching," and said that she had "thought about it" and "cried about it," and that confronting him was the hardest thing she had ever done.  (Plaintiff's Exh. 26.)  Hudson responded that he understood, that he had thought about it, and that he realized he had been "out of bounds."  (*Id.*)  Hudson assured her that "[t]hat's behind us," that everything was "fine," and that "there will be no repercussions from me."  (*Id.*)  After this conversation, McCulley experienced no further difficulties with Hudson between October 2001 and

early May 2002, however, plaintiff's evidence (which defendants dispute, but which the Court accepts for Rule 56 purposes) is that Hudson initiated a barrage of egregious sexual harassment directed at her. According to plaintiff, Hudson began groping and fondling her on a daily or near-daily basis, by touching her legs, buttocks, breasts and crotch area.  (McCulley Aff., ¶ 20; McCulley Dep., at 26, 106-07, 109, 112-14, 166.)[39]  In response to Hudson's inappropriate physical contact, McCulley would slap his hand, push him away, tell him to stop, state that she did not like for him to touch her, and try to avoid him.  (McCulley Dep., at 109, 110, 113, 116, 166.)  In her own words, McCulley "asked him to stop a million times."  (Defendants' Exh. 37; McCulley Dep. II, at 106.)  Hudson would laugh, and would sometimes apologize and say he could not control himself, but would then resume such conduct shortly thereafter.  (McCulley Dep. at 110, 113, 116, 117, 166.)  McCulley's evidence is that Hudson's physical touchings were accompanied by sexually explicit comments directed at plaintiff's reproductive anatomy and sex life.[40]

McCulley attempted to address Hudson's behavior directly with him in an effort to make him stop.  (McCulley Aff., ¶ 27.)  When those efforts were unsuccessful, she recognized that she needed to report his behavior to BE&K Engineering; however, she was concerned that she would not be believed.  She also feared retaliation, particularly in light of the fact that ViaTech (a sister company to BE&K Engineering) had fired her after she complained of sexual harassment and retaliation.  (*Id.*, ¶¶

---

April 2002.  (McCulley Dep., at 98-99.)  McCulley agreed to work for Hudson in April 2002, notwithstanding this history, because she felt that the previous situation had been resolved and because she needed a job after ViaTech laid her off.  (*Id.* at 99; Defendants' Exh. 5, at 2.)

[39]     McCulley testified that these inappropriate sexual touchings by Hudson would occur when they were in the car or when they were alone in the office.  (McCulley Dep., at 115.)

[40]     Among the graphic comments that McCulley ascribes to Hudson are statements that "I am just glad somebody is fucking you since I'm not," "I know you don't like for me to touch your pussy, but I'm going to do it anyway," "I bet you have a beautiful pussy," and "I would love to see your pussy."  (McCulley Dep., at 22-23, 112-13; McCulley Aff., ¶ 21.)

28-29.)[41]  To bolster her evidence against Hudson, McCulley purchased and installed video and audio surveillance equipment for her vehicle on or about June 4, 2002.  (*Id.*, ¶ 31; McCulley Dep., at 80-81; McCulley Dep. II, at 87-88.)  According to plaintiff, the timing of her purchase and installation of the surveillance equipment was driven by her desire not to be harassed any more.  (McCulley Dep. II, at 88.)

    3.  *The Video and Its Aftermath.*[42]

   On June 5, 2002, with surveillance equipment activated, plaintiff and Hudson traveled to lunch in plaintiff's vehicle, with McCulley driving.[43]  The video (apparently taken from two cameras, one mounted in the dome light area of plaintiff's vehicle and the other in the rear seat area) reflects that after a short time, Hudson stated, "Just in case you think I don't love you any more," at which time he abruptly reached over to plaintiff's leg.  (Plaintiff's Exh. 12.)  The video clearly shows his hand move quickly up the inside of plaintiff's skirt to her crotch.  (*Id.*)  Plaintiff immediately pushed his hand away, adjusted her skirt, said "Don't touch me," indicated that it bothers her, and stated that Hudson is

---

  [41]  Plaintiff's fear that BE&K Engineering would not believe her allegations regarding Hudson was prophetic.  In a written response to her internal complaint, BE&K Engineering's counsel, Nicholas Bouler, intimated that McCulley "is willfully (and perhaps even viciously) lying," suggested that she was "beneath contempt" for posing such accusations, demanded "complete retraction of the charges against Mr. Hudson" as a condition to any resolution of the matter, and stated that "we believe the charges are not merely unfounded but are intentional falsehoods."  (Plaintiff's Exh. 15.)

  [42]  The Court has carefully reviewed the videotaped evidence presented in the parties' summary judgment submissions.  (Plaintiff's Exh. 12; Defendants' Exh. 36.)  Unfortunately, defendants' exhibit includes selected portions of only one of the two existing angles of video footage, while plaintiff's exhibit includes both camera angles, but has apparently not been edited, forcing the Court to sift through hours of useless footage in which exactly nothing happens (*i.e.*, while the plaintiff's vehicle is parked and empty).  The parties could have made the undersigned's task of reviewing the video evidence in this case much easier by submitting a single DVD or VHS tape including both camera angles and editing out the multiple hours of extraneous footage showing the view from plaintiff's parked, unoccupied vehicle.

  [43]  Originally, plaintiff and Hudson were scheduled to meet a client for lunch that day; however, the client canceled the appointment, so plaintiff and Hudson proceeded to lunch on their own. (McCulley Dep., at 159.)

"always reaching for" her.  (Plaintiff's Exh. 12; Defendants' Exh. 36 & 37.)[44]  The remainder of

plaintiff's interaction with Hudson captured on the tape contains no reference to or discussion of the

touching incident.  They apparently proceeded to eat lunch together as planned, and their recorded

conversation returned to mundane work-related matters and other run-of-the-mine topics.  (Hudson

Dep., at 133; Defendants' Exh. 36 & 37.)[45]  Nonetheless, plaintiff testified that she was "very upset" by

what had transpired.  (Hudson Dep., at 168.)

That afternoon, McCulley returned to work at least briefly, where a co-worker overheard her

mentioning that she would have to be at work early the following morning so that she and Hudson could

---

[44]     In his deposition, Hudson endeavored to explain his conduct by stating that plaintiff was
distraught about her financial circumstances and that "in my mind, I was trying to be reassuring when I
touched her.  It was not a sexual intent on my part."  (Hudson Dep., at 42.)  Although the images on
videotape do not appear reconcilable with a non-sexual interpretation, that question will be left to a jury
to decide.  Likewise, it is a jury's responsibility to weigh the credibility of Hudson's contention that he
touched McCulley in that manner "on one occasion."  (Hudson Dep., at 23.)  The jury will also be
tasked with evaluating defendants' characterization that Hudson was "visibly and audibly surprised by
her objection to the touching," although repeated viewings of the relevant footage have not enabled the
Court to perceive any "surprise" in Hudson's speech or body language.  (BE&K Engineering Brief, at
20.)

[45]     In their filings, defendants make much of certain communications captured on the
videotape prior to and following the touching incident.  In particular, defendants stress the following
aspects of the video: (a) prior to leaving her home that morning, the microphone captures McCulley's
boyfriend asking, "Are you excited?"; and (b) after Hudson was out of the vehicle, McCulley called her
sister and made comments such as "Aren't you happy for me," and "I will have ten of these over the
next three weeks."  (Defendants' Exh. 37.)  Defendants also maintain that McCulley stated on the
video that she was "thrilled" by what transpired; however, plaintiff testified that her words were
"surreal" or "for real."  (McCulley Dep., at 180; Defendants' Exh. 37.)  There is therefore a dispute of
fact as to whether plaintiff ever characterized her mood as "thrilled" in the wake of the June 5 incident.
Moreover, defendants impute impropriety to McCulley for failing to disclose the existence of the
videotape to BE&K Engineering right away.  (BE&K Engineering Brief, at 7, 9.)  But plaintiff was
under no legal obligation to tip her hand to defendants, particularly where defendants never attempted
to meet with her and never accepted her attorney's invitation that they pose written questions to her to
hear her side of the story.  (Bouler Dep., at 115-17.)  Defendants do not suggest that plaintiff lied to
them about the videotape; rather, defendants simply never asked.  Defendants' failure to question
plaintiff renders them at least as culpable as plaintiff for their lack of earlier notice of the existence of the
video.

travel to a client meeting in Jackson, Alabama. (Thompson Aff., at 3.)[46] Otherwise, plaintiff spent the afternoon watching the videotapes she had recorded that day with her vehicular surveillance equipment, as well as meeting with her attorney. (Hudson Dep., at 187, 189.) At approximately 8:00 p.m. that evening, McCulley returned to the premises of BE&K Engineering for roughly 15 minutes. (Hudson Dep., at 139; McCulley Dep., at 132-33.) During that short visit, McCulley deleted various materials from her computer (including all electronic mail messages, her sales contact list, her weekly sales reports, and other sales documents) and removed her personal belongings. (McCulley Dep., at 12-13, 15, 133, 190.)[47]

On the morning of June 6, 2002, McCulley did not show up at work and did not immediately notify anyone at the company of her whereabouts or intentions. (McCulley Dep., at 193-95; Hudson Dep., at 139, 144.) Hudson and other BE&K Engineering employees called her various telephone numbers without being able to reach her, after which Hudson proceeded to the client meeting as scheduled, without plaintiff. (Hudson Dep., at 140; Kirkland Aff., at 3; Thompson Aff., at 4.) According to defendants, no one thought to check McCulley's office until after lunch that day, at which time they observed that her personal items had been removed. (Thompson Aff., at 4.)

4.    *Post-Video Communications between Plaintiff and BE&K Engineering.*

Also on June 6, 2002, plaintiff's counsel transmitted a letter to BE&K's in-house counsel, Nicholas Bouler, via facsimile. (Defendants' Exh. 38.) The summary judgment record does not reflect the time of day when the fax was sent; however, defendant acknowledges that it was sent that morning. (BE&K Engineering Brief, at 30.) In this letter, plaintiff's counsel apprised Bouler of McCulley's allegations that Hudson had been subjecting her to pervasive sexual harassment, including detailed descriptions of his touchings and his vulgar comments, as well as allegations that her efforts to prevail

---

[46]    Defendants also cite to pages 137 and 138 of Hudson's deposition for this proposition. Unfortunately, the referenced pages were omitted from the summary judgment record, so the Court cannot refer to or rely on them.

[47]    In her deposition, plaintiff explained that she "wasn't going to go back there until the situation was resolved," but that she nevertheless "thought [she] would get to keep [her] job." (Plaintiff's Dep., at 190-91.)

upon Hudson to stop the harassment had failed.  (*Id.*)  The letter requested that Bouler investigate those contentions immediately, and grant McCulley a "paid leave of absence" for the duration of that investigation.  (*Id.*)  Plaintiff's counsel requested that Bouler contact him to work out the details of the leave arrangement.  (*Id.*)  The June 6 letter undisputedly marks the first time that plaintiff notified BE&K Engineering of her concerns regarding Hudson.  On June 7, 2002, plaintiff's counsel faxed another letter to Bouler expressing willingness to mediate his client's claims, pursuant to BE&K's Employee Solutions Program ("ESP").  (Plaintiff's Exh. 14.)

For eight days following the June 6 letter, the parties were at a standstill.  McCulley was not coming to work.  There was no contact between McCulley and BE&K Engineering.  And BE&K Engineering did not respond to the June 6 or June 7 letters.  McCulley's work status was apparently unknown to and undecided by anyone.

Despite McCulley's request for a leave of absence while her allegations were investigated and despite her counsel's invocation of the ESP, Bouler and Hudson had a telephone conversation on or about June 10, 2002, in which it was decided that McCulley's employment would be terminated because she had not shown up for work in several days.  (Hudson Dep., at 102-03; Bouler Dep., at 96, 98.)  There is some dispute as to whether Hudson or Bouler actually made the decision to fire McCulley.  Viewed in the light most favorable to plaintiff, however, the evidence is that Hudson made the decision, and that Bouler simply advised him that it "would be okay" to do so.  (Bouler Dep., at 98-99.)[48]  Also viewed in the light most favorable to McCulley, the evidence is that Hudson was aware on

---

[48]      In particular, Bouler balked at a question asking about his instruction to Hudson to discharge plaintiff, stating that "I gave him the advice that it would be okay to terminate her, which is a better way to characterize it."  (Bouler Dep., at 98.)  Bouler elaborated that "the managers make that decision," not the legal department.  (*Id.* at 99.)  According to Bouler, Hudson "felt ... that termination was the right course of action for somebody that has abandoned their employment, and I think he wanted to give me a heads up" as to Hudson's decision.  (*Id.*)  This testimony belies and flatly contradicts defendant's characterization as undisputed fact that "Hudson did not make the decision to terminate her" and that Bouler "instructed Hudson to terminate Plaintiff."  (Reply Brief, at 5.)  Given the obvious ambiguity in the record, the Court questions why such misleading representations were included in defendant's reply brief.  In any event, based on Bouler's testimony, there is absolutely a genuine issue of material fact as to whether Hudson was the decisionmaker in this case.

June 10 that McCulley had made allegations of harassment against him. (Hudson Dep., at 103.) It is undisputed that Hudson signed McCulley's termination paperwork, with an effective date of June 7, 2002, although the documentation was actually completed several days later. (*Id.* at 102.)

On June 14, 2002, Bouler finally responded in writing to plaintiff's counsel's correspondence of June 6 and 7. Bouler's letter omitted reference to the ESP, and ignored plaintiff's effort to invoke the ESP's mediation provision. (Defendants' Exh. 39.)[49] Instead, Bouler's letter accused McCulley of intentionally, maliciously fabricating her allegations against Hudson;[50] indicated that no paid leave would be approved; and advised plaintiff's counsel that McCulley's "employment has been terminated as of June 7, 2002, for failure to report for work without explanation." (*Id.*) Of course, BE&K Engineering was well aware that prior to June 7, 2002, McCulley had in fact furnished a written "explanation" for her failure to report to work, namely, Hudson's egregious harassment of her and her request for investigation and a leave of absence during the pendency of same.

> **5.** *Procedural Posture.*

On August 7, 2002, McCulley filed an amended EEOC charge against Allstates, ViaTech, and BE&K Engineering, and incorporating allegations relating to the Hudson harassment and the subsequent termination of her employment effective June 7, 2002. (Complaint, at Exh. 4.) On October 31, 2003, the EEOC issued a written determination letter finding merit to certain of Hudson's claims but not to others. (*Id.* at Exh. 5.) Plaintiff received a "notice of right to sue" from the EEOC dated December 3, 2003. (*Id.* at Exh. 6.)

---

[49]   When questioned in his deposition as to why BE&K Engineering failed to respond to McCulley's request for mediation pursuant to the company's ESP program for more than 18 months, Bouler testified that "I think I had forgotten .... No, I don't have a good answer for that." (Bouler Dep., at 144.)

[50]   Even as he accused McCulley of "viciously lying" and being "beneath contempt," Bouler admitted that he would not be able to assess her allegations without eliciting information from her as to "date, time and place." (Defendants' Exh. 39.) Bouler also stated, "I appreciate your offer to respond to interrogatories and I will take advantage of that promptly." (*Id.*) Yet Bouler never posed such interrogatories in the course of investigating McCulley's allegations, and never otherwise attempted to learn her side of the story. When pressed for an explanation for this omission, Bouler simply said, "I never got around to it." (Bouler Dep., at 116.)

On February 17, 2004, plaintiff initiated this lawsuit against Allstates, ViaTech, BE&K, Inc., and Hudson, alleging claims under Title VII for sexual harassment/discrimination and retaliation, as well as state-law claims for negligence/wantonness and for assault and battery (the last being against Hudson only).  On April 28, 2004, plaintiff filed an Amended Complaint (doc. 13) adding BE&K Engineering as a party defendant.

In its Rule 56 motion, BE&K Engineering launches a full-scale offensive against plaintiff's allegations, including the following five distinct theories for relief: (a) the Title VII claims against it are untimely; (b) the Title VII harassment claims fail because McCulley did not subjectively perceive Hudson's behavior as hostile or unwelcome; (c) the Title VII harassment claims fail under the *Faragher*/*Ellerth* affirmative defense; (d) the Title VII retaliation claims fail because there was no statutorily protected activity and no evidence of pretext; and (e) BE&K Engineering cannot be liable for assault and battery or negligence/wantonness under the facts presented here.  The Court will analyze each of these defenses in turn.[51]

### B.   Timeliness of Title VII Claims against BE&K Engineering.

BE&K Engineering argues that plaintiff's Title VII claims are untimely as to it because it was not named as a defendant in this litigation until April 28, 2004, or 146 days after the EEOC provided plaintiff with a right to sue letter.  (BE&K Engineering Brief, at 35.)[52]  McCulley's Complaint was filed

---

[51]      In its reply brief, BE&K Engineering presents for the first time, without explanation or excuse for its prior omission, a new request for summary judgment on plaintiff's Title VII sex discrimination claim predicated on wrongful termination.  (Reply Brief (doc. 118), at 11-13.)  As the Court has pointed out repeatedly *supra*, arguments presented for the first time in a reply brief are generally not proper and will not be considered.  Given the lack of any justification for BE&K Engineering's failure to address the wrongful termination claim in its sprawling 38-page principal brief, the Court will not address the merits of the untimely-raised Rule 56 request on that claim presented for the first time in a reply brief.

[52]      BE&K Engineering first raised the exhaustion argument in a reply brief in support of its Motion to Dismiss filed at the outset of this litigation.  In an Order (doc. 24) dated June 7, 2004, the Court declined to consider this argument because of the manner in which it was raised.  Nonetheless, the Order expressly left open the possibility that BE&K Engineering could litigate that issue in the context of a Rule 56 motion if it so desired.  (June 7 Order, at 11 n.14.)  BE&K Engineering now avails itself of that opportunity.

within 90 days after the EEOC notice; however, it failed to name BE&K Engineering as a defendant,
listing only Allstates, ViaTech, BE&K, Inc., and Hudson.  McCulley did not rectify this omission until
April 28, 2004, well after the 90-day deadline had expired, when she filed an Amended Complaint
naming BE&K Engineering as an additional defendant.

Title VII provides that a complainant must bring a civil action within 90 days after receiving a
right to sue notice from the EEOC.  *See* 42 U.S.C. § 2000e-5(f)(1); *Kerr v. McDonald's Corp.*, 333
F. Supp.2d 1352, 1358 (N.D. Ga. 2004) ("filing an action within 90 days of receipt of a notice of right
to sue from the EEOC is a condition precedent to bringing an action under [Title VII]").  "Once the
defendant contests this issue, the plaintiff has the burden of establishing that he met the ninety day filing
requirement."  *Green v. Union Foundry Co.*, 281 F.3d 1229, 1234 (11th Cir. 2002) (citing *Jackson
v. Seaboard Coast Line R. Co.*, 678 F.2d 992, 1010 (11th Cir. 1982)).

Plaintiff concedes that BE&K Engineering was added as a defendant in this action more than 90
days after the EEOC issued her a right to sue notice.  Nonetheless, she maintains that her Title VII
claims against BE&K Engineering are timely because the Amended Complaint relates back to the
undeniably timely original Complaint, pursuant to Rule 15(c)(3), Fed.R.Civ.P.[53]  That rule provides that
an amendment adding a new party will be deemed to relate back only if all of the following criteria are
satisfied: (i) "the claim or defense asserted in the amended pleading arose out of the conduct,
transaction, or occurrence set forth or attempted to be set forth in the original pleading"; (ii) within 120
days after the original Complaint, the newly named defendant "has received such notice of the institution
of the action that the party will not be prejudiced in maintaining a defense on the merits"; and (iii) within
120 days after the original Complaint, the newly named defendant "knew or should have known that,
but for a mistake concerning the identity of the proper party, the action would have been brought
against the party."  Rule 15(c)(3); *see also Cliff v. Payco General American Credits, Inc.*, 363 F.3d
1113, 1131 (11th Cir. 2004) ("[W]hen an amendment seeks to change a party against whom a claim is

---

[53]     The law is clear that Rule 15(c)(3) is the only mechanism through which a plaintiff can
survive a timeliness objection where she has amended her complaint to add a party after the running of
the relevant limitations period.  *See Powers v. Graff*, 148 F.3d 1223, 1225 (11th Cir. 1998).

asserted ..., Rule 15(c)(3) requires more than a showing that the claim arose out of the same conduct or transaction originally pleaded; when an amendment seeks to change or add a defendant, Rule 15(c)(3) introduces considerations of both prejudice and notice.").

There can be no reasonable dispute that the first two prongs of Rule 15(c)(3) are satisfied here. McCulley's claims against BE&K Engineering unquestionably arise from the transactions and occurrences set forth in the original Complaint.  Moreover, given that several other BE&K entities were named defendants and given the evidence of the intertwined nature of BE&K Engineering and the other BE&K entities,[54] BE&K Engineering cannot reasonably assert that it lacked notice of the institution of the action within 120 days after the filing of the original Complaint, much less that it would be prejudiced in maintaining a defense on the merits.[55]  Therefore, the "relation back" inquiry hinges on whether BE&K Engineering knew or should have known that it would have been a named defendant at the inception of this lawsuit but for a mistake concerning its identity.

In *Powers v. Graff*, 148 F.3d 1223 (11th Cir. 1998), and *Wayne v. Jarvis*, 197 F.3d 1098 (11th Cir. 1999), the Eleventh Circuit definitively explained the meaning and scope of the "mistake" requirement of Rule 15(c)(3).  The mistake proviso is "meant to allow an amendment changing the name of a party to relate back to the original complaint only if the change is the result of an error, such as a misnomer or misidentification." *Wayne*, 197 F.3d at 1103 (citation omitted).  To effectuate the

---

[54]     For example, Allstates, ViaTech, and BE&K Engineering were all represented by the same in-house BE&K attorney during the administrative proceedings, and all of the corporate defendants (including BE&K Engineering) are represented by the same outside counsel in this litigation. Although the court file lacks the return of service form required by Rule 4(*l*), Fed.R.Civ.P., for defendant BE&K Engineering, defendants do not challenge plaintiff's representation to the Court that all of the BE&K entities were served at the same address.

[55]     BE&K Engineering insinuates otherwise.  (Reply Brief (doc. 118), at 4.)  To the extent that BE&K Engineering maintains that it received inadequate notice of the Complaint within the time frame authorized by Rule 4(m), such an argument is simply not credible.  Besides, there can be no question that BE&K Engineering had notice of the initial Complaint within 120 days after its filing because that defendant filed its answer to the Amended Complaint on June 18, 2004, or 122 days after the initial Complaint was filed.  (Plaintiff's counsel's contention that the answer was filed within 120 days after the Complaint is incorrect, but the sentiment – that BE&K Engineering must have had notice of the Complaint within 120 days after its filing – remains valid.)

purposes of the rule, however, courts "read the word 'mistake' in Rule 15(c) liberally." *Id.* (citation omitted). Simply put, Rule 15(c)(3) is designed to ensure that a potential defendant who has not been named in a lawsuit prior to expiration of the limitations period has repose, "unless it is or should be apparent to that person that he is the beneficiary of a mere slip of the pen, as it were." *Powers*, 148 F.3d at 1227 (citation omitted). In applying this standard, the Eleventh Circuit has made clear that the term "mistake" does not encompass circumstances where a plaintiff failed to name a defendant because he lacked knowledge of its identity, or where a plaintiff makes a deliberate strategic decision not to name a particular defendant. *See Wayne*, 197 F.3d at 1103 (opining that plaintiff's lack of knowledge was not an error, a misnomer or a misidentification); *Powers*, 148 F.3d at 1227-28 (no mistake where plaintiffs made deliberate decision not to sue particular defendants).[56]

On the record before it, the Court readily concludes that, within 120 days after the filing of the original Complaint, BE&K Engineering knew or should have known that plaintiff's failure to list it as a named defendant in the Complaint was an error, not a strategic decision. Plaintiff's EEOC charge specifically named BE&K Engineering. Her Complaint was riddled with allegations concerning alleged discriminatory and retaliatory treatment during her employment at BE&K Engineering. Most significantly, the Complaint included a paragraph stating in its entirety as follows: "Defendant BE&K, Inc., is the parent corporation of BE&K Construction Company, BE&K Engineering Company and numerous other corporations. Plaintiff will hereafter refer to ***these Defendants collectively*** as BE&K, Inc." (Complaint (doc. 1), ¶ 6 (emphasis added).) Plaintiff's use of the plural in that paragraph shows that plaintiff considered both BE&K, Inc. and BE&K Engineering Company to be defendants in this matter; otherwise, the reference to "these Defendants collectively" would be nonsensical. Clearly, then, BE&K Engineering is listed in the body of the Complaint as a defendant, but is omitted from its caption. From a reasonable reading of the Complaint and a working knowledge of the surrounding circumstances, a reasonable prospective defendant in BE&K Engineering's position

---

[56]     One commentator has reinforced these decisions by explaining that "[a] court should not limit its findings of mistake merely to cases of misnomer. Rather it should focus on the new party's appreciation of the fact that the failure include it in the original complaint was an error and not a deliberate strategy." *Moore's Federal Practice* (3d ed.), § 15.19[3][d].

could not conclude that its omission as a named defendant was the product of a strategic decision by plaintiff not to sue it rather than a proverbial "slip of the pen" by plaintiff's counsel. *Compare Powers*, 148 F.3d at 1227-28 (failure to sue defendant was strategic decision when plaintiff failed to amend complaint to include that party as a defendant until learning that another named defendant was going out of business and might be facing insolvency).[57]  In light of these findings and the liberal meaning to be accorded the term "mistake" in Rule 15(c)(3), the Court concludes that the Amended Complaint relates back to the date of the original Complaint, and that the Title VII claims raised against BE&K Engineering are therefore timely.  Defendant's request for summary judgment on limitations grounds is **denied**.

### C.    Analysis of Title VII Harassment Claim.

#### 1.    The Elements of the Claim are Satisfied.

To establish a claim that she was subjected to a sexually hostile work environment in violation of Title VII, a plaintiff must show the following: (i) that she belongs to a protected group; (ii) that she was subject to unwelcome sexual harassment; (iii) that the harassment was based on her sex; (iv) that the harassment was sufficiently pervasive or severe to alter her terms and conditions of employment and create a discriminatorily abusive work environment; and (v) a basis for holding the employer liable.  *See Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999); *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004) (same); *see also Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (a hostile work environment exists under Title VII where "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.").

Defendant's Rule 56 motion calls into question the fourth criterion, namely, whether the harassment was sufficiently pervasive or severe to alter the terms and conditions of McCulley's

---

[57]    Tellingly, BE&K Engineering has not represented to the Court that it failed to comprehend that its exclusion from the caption of the original Complaint was the product of an error by plaintiff's counsel.

employment at BE&K Engineering.  (Defendant's Brief (doc. 96), at 17-27.)  "Harassment is severe or pervasive for Title VII purposes only if it is both subjectively and objectively severe and pervasive." *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509 (11th Cir. 2000); *see also Hulsey*, 367 F.3d at 1247 (explaining that a hostile work environment is actionable under Title VII only if the environment is "both objectively and subjectively offensive, one that a reasonable person would find hostile and abusive, and one that the victim in fact did perceive to be so"); *Watkins v. Bowden*, 105 F.3d 1344, 1355 (11th Cir. 1997) ("if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation").  Defendant does not argue that a reasonable person would not find hostile and abusive the litany of alleged improper touchings and sexually explicit statements that McCulley attributes to Hudson.[58]  Rather, the focal point of BE&K Engineering's argument is that McCulley cannot proceed on her Title VII sexual harassment claims because she did not subjectively perceive Hudson's conduct to be hostile.[59]

The Eleventh Circuit has held that "sexual harassment is subjectively severe and pervasive if the complaining employee perceived it to be at the time."  *Hulsey*, 367 F.3d at 1248 (subjective requirement satisfied where plaintiff testified that harasser's conduct caused her emotional distress, that she consistently refused his advances, and that she told him to leave her alone).  Here, there is a

---

[58]    Given the flagrancy and intensity of the alleged misconduct, any suggestion that it might fall short of the objectively hostile threshold would be frivolous.  *Compare Hulsey*, 367 F.3d at 1248 (standard satisfied where supervisor engaged in 18 acts of misconduct over two week period, including propositions for sex, following plaintiff into restroom, and attempting to grope her breasts and remove her pants) *and Johnson*, 234 F.3d at 509 (hostile work environment existed where harasser engaged in 15 acts in four-month period, including repeatedly attempting to massage plaintiff's shoulders, pulling up his pants to reveal imprint of genitals, inappropriately rubbing his body against plaintiff, getting close to plaintiff's face as if to kiss her, and engaging in sexually charged comments, gestures and stares); *see generally Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1277 (11th Cir. 2002) (explaining that harassment need not be so extreme that it produces tangible effects on job performance in order to be actionable).

[59]    The Court views this theory for summary judgment to be substantively identical to BE&K Engineering's alternative formulation that Hudson's conduct toward McCulley was not "unwelcome."  (BE&K Engineering Brief, at 18.)

-38-

veritable avalanche of evidence from which a reasonable factfinder could conclude that McCulley perceived Hudson's actions to be severe, pervasive and sexually hostile.  In her deposition, McCulley testified that on the numerous occasions when Hudson groped her, fondled her or made blatantly sexual comments to her, she consistently told him to stop and pushed him away.  Taped conversations confirm that on at least two occasions she confronted him about unwanted touchings.  Indeed, plaintiff's evidence is that she repeatedly, consistently told him that his sexually charged comments and groping made her uncomfortable and that she wanted him to stop.  (McCulley Aff., ¶¶ 23-25.)  She further testified that Hudson's actions were "so humiliating to me," and that his reaction to her complaints made her think that "it was all just like a joke to him."  (McCulley Dep., at 116.)  According to McCulley, she was so "distraught" by Hudson's continuing offensive sexual conduct towards her that she contemplated suicide.  (*Id.* at 29-30.)  The summary judgment record also reflects that as a direct result of Hudson's conduct, plaintiff suffers from depression and anxiety, and is being treated by a clinical psychologist.  (McCulley Aff., ¶ 33.)  Given this overwhelming evidence of subjective hostility, coupled with the extreme and shocking nature of the conduct ascribed to Hudson, there is unquestionably sufficient evidence that McCulley's work environment was subjectively hostile and abusive.[60]

BE&K Engineering's argument to the contrary is predicated on evidence that McCulley often hugged Hudson in the workplace,[61] that she engaged in risqué or flirtatious e-mail correspondence with a customer six months before accepting employment at BE&K Engineering,[62] that she rigged her

---

[60]     BE&K Engineering's assertion that McCulley did not find Hudson's conduct offensive effectively asks the Court to disregard this abundant evidence that she was tormented and haunted by his actions.  The summary judgment standard forbids the Court from doing so.

[61]     Certain co-workers averred that McCulley routinely gave hugs to Hudson and to no one else.  (Noce Aff., at 2-3; Kirkland Aff., at 2; Thompson Aff., at 2-3.)  However, that evidence itself is disputed, as McCulley testified that, in total, she had initiated hugs with Hudson "[m]aybe once or twice."  (McCulley Dep., at 130.)

[62]     These e-mails did not involve Hudson even tangentially, but were between plaintiff and a client named Bob Shank (whom defendants emphasize was married), and were written in the fall of 2001.  The messages did not contain openly sexual communications, but rather were limited to comments such as "You love me so bad because I am so damn cute and smart too," or "Good

vehicle with surveillance equipment as a means of entrapping Hudson, that she did not report Hudson's conduct to BE&K before engaging in such an elaborate surveillance scheme, and that she made comments on the surveillance tape suggesting that she was "thrilled" and "happy" to have "gotten it all" on tape after Hudson had reached his hand up her skirt and into her vaginal area.[63]  Such evidence could validly form a cornerstone of a defense argument that McCulley in fact welcomed Hudson's conduct and did not find it offensive.  "That argument is one [BE&K Engineering] may make, but it should be made to the jury at trial," not to this Court on summary judgment, in light of the extensive evidence to the contrary.  *Hulsey*, 367 F.3d at 1249.  After all, "it is for the jury, and not the district court, to decide which party's rendition of fact is more credible."  *Johnson*, 234 F.3d at 511.  Defendant's request for summary judgment on grounds that plaintiff has failed to show the elements of a sexual harassment claim is **denied**, given the obvious lingering questions of material fact.

---

morning, my heavenly little enchantress," or "And how come you are so damned cute?" or "I need you white now, my gorgeous little geisha."  (Defendant's Exh. 40.)  Notwithstanding the fact that BE&K Engineering devoted fully 2½ pages of its principal brief to reproducing block quotations from that e-mail correspondence, it is far from clear that such materials have any relevance to these proceedings (other than to impugn plaintiff's character by suggesting that she had previously had an affair or interacted flirtatiously with a married customer), much less that they would be admissible under Rules 403 and 412.  Plaintiff expressed an intent to file a motion to strike such materials from the record, but never followed through.  (Plaintiff's Brief (doc. 109), at 33 n.14.)  To the extent that defendants intend to rely on such evidence at trial, the Court expects the evidentiary questions surrounding it to be addressed via motion in limine.

[63]    Of course, these comments are subject to two very different, but equally plausible inferences.  The first (championed by BE&K Engineering) is that McCulley was not bothered or offended by Hudson's actions at all, but that she was delighted by his actions because they gave her leverage over BE&K.  The second is that McCulley was offended by Hudson's conduct and that she was pleased not that Hudson had reached for her private parts, but that she had caught him in the act so that her forthcoming accusations that he had inappropriately touched her on an ongoing basis might be taken seriously by BE&K and result in cessation of the harassment.  This latter interpretation is bolstered by McCulley's statements on the video (while talking to her sister) that "I've asked him to stop a million times," "he does, that's the whole problem," and "do you know how many women he's probably done this to? ... I can assure you that whoever he was doing this to before me is thrilled I'm at BE&K."  (Defendants' Exh. 37, at 9.)  It will be a jury's responsibility to ascertain which of these competing inferences is accurate.

2.     *Defendant is Not Entitled to Summary Judgment Based on the* Faragher /
       Ellerth *Defense.*

Defendants next seek protection of the affirmative defense outlined by the Supreme Court in the landmark cases of *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).  Pursuant to those decisions, if a supervisor sexually harasses a subordinate and the harassment "results in an adverse 'tangible employment action' against the employee, the employer is automatically held vicariously liable for the harassment."  *Walton v. Johnson & Johnson Services, Inc.*, 347 F.3d 1272, 1280 (11th Cir. 2003); *see also Hulsey*, 367 F.3d at 1245 ("An employer is liable under Title VII if it (even unknowingly) permits a supervisor to take a tangible employment action against an employee because she refused to give in to his sexual overtures").  By contrast, if the supervisor's harassment does not result in an adverse tangible employment action, then the employer may evade liability under the *Faragher / Ellerth* framework by proving by a preponderance of evidence both "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Walton*, 347 F.3d at 1286 (citation omitted).

Thus, the threshold question for the *Faragher/Ellerth* analysis is whether a tangible employment action has occurred.  As defined by the Supreme Court, a tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Pennsylvania State Police v. Suders*, 542 U.S. 129, 124 S.Ct. 2342, 2353, 159 L.Ed.2d 204 (2004) (citation omitted).  "A discharge is unquestionably a tangible employment decision."  *Walton*, 347 F.3d at 1281 (explaining that "tangible employment action" includes such acts as discharge, demotion or undesirable reassignment).  Where a tangible employment action has occurred, the *Faragher/Ellerth* defense is unavailable as a matter of law.  *See Hulsey*, 367 F.3d at 1247 ("The *Faragher-Ellerth* affirmative defense is irrelevant to the tangible employment action theory of recovery.").

-41-

In its principal brief, BE&K Engineering stated in conclusory terms that "there was no 'tangible employment action' taken by Hudson with respect to Plaintiff."  (BE&K Engineering Brief, at 11.) When plaintiff asserted in her opposition brief that a tangible employment action had occurred, inasmuch as Hudson had fired her, BE&K responded by citing as "critical undisputed facts" that Hudson lacked authority to terminate McCulley, that Hudson did not make the firing decision, that Bouler instructed Hudson to fire McCulley, and that Hudson signed McCulley's termination papers only after being instructed by Bouler to fire her.  (Reply Brief, at 5.)  Try as it might, however, BE&K Engineering cannot wish Bouler's contrary deposition testimony out of existence, nor does Rule 56 afford it license to sweep his directly contradictory statements under the rug and pretend they were never made.  As discussed *supra*, the fact of the matter is that Bouler's testimony presents substantial evidence from which a reasonable factfinder could conclude that Hudson (and not Bouler or anyone else) personally possessed and exercised the authority to fire McCulley effective June 7, 2002, just two days after she confronted him about unwanted sexual touchings.  On a Rule 56 analysis, a movant lacks the luxury of being able to pick and choose which record evidence is to its liking and which it would prefer the Court disregard.  Inasmuch as BE&K Engineering's representations that it is undisputed that Hudson did not fire McCulley are incorrect and irreconcilable with the clear testimony of its own in-house counsel, the Court finds a genuine issue of material fact as to whether Hudson's sexual harassment of plaintiff resulted in tangible employment action against her for refusing to accede to his overtures.  Accordingly, the Court cannot determine, as a matter of law, that BE&K Engineering is even eligible for the *Faragher*/*Ellerth* defense, and defendant's request for summary judgment on that basis is **denied**.[64]

---

[64]    Even if there were no jury question as to whether a tangible employment action occurred, the Court would decline to award summary judgment to BE&K Engineering on a *Faragher*/*Ellerth* theory.  To avail itself of that affirmative defense, the employer must prove that the employer acted reasonably to prevent and correct harassment and "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer, or to otherwise avoid harm."  *Walton*, 347 F.3d at 1289 (quoting *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1313 (11th Cir. 2001)).  Viewed in the light most favorable to the plaintiff, the summary judgment record reflects the following: (a) plaintiff repeatedly

####    D.      *Analysis of Title VII Retaliation Claim.*

Plaintiff has also brought a Title VII retaliation claim against BE&K Engineering, alleging that her employment was terminated in retaliation for her internal complaints that Hudson sexually harassed her.  Defendant seeks summary judgment on that cause of action on the following grounds: (a) plaintiff failed to engage in statutorily protected activity; (b) plaintiff was not subjected to adverse employment action; and (c) there is no evidence that BE&K Engineering's stated explanation for her termination is pretextual.  None of these contentions are persuasive in the context of a Rule 56 inquiry.

Because the Court has previously outlined the appropriate legal standards for Title VII retaliation claims in some detail in the context of ViaTech's motion for summary judgment, it will not replicate the exercise here.  Suffice it to say that plaintiff must prove a *prima facie* case of retaliation by showing that she engaged in protected activity, that she was subjected to adverse employment action, and that there was a causal connection between the two.  If McCulley successfully makes out a *prima facie* case, then the burden shifts to BE&K Engineering to show a legitimate nondiscriminatory reason for the challenged employment action.  If BE&K satisfies that obligation, then McCulley must show that the employer's stated reason for the adverse employment action was pretextual.

BE&K Engineering first argues that McCulley cannot show a *prima facie* case because she did not engage in protected activity.  According to defendant, McCulley's evidence is wanting in this regard

---

advised Hudson that his advances were unwelcome and sought unsuccessfully to bring them to an end, as required by the company's "open-door policy"; (b) within a month after Hudson's harassing conduct began, plaintiff provided the company with graphic details of that conduct in writing; (c) plaintiff requested a leave of absence during the company's investigation of her allegations; (d) although she was represented by counsel, plaintiff offered to cooperate with the company's investigation; (e) plaintiff requested mediation under the ESP; (f) BE&K Engineering failed to conduct a reasonable investigation of her allegations by neglecting even to ask her a single question, and instead confining its investigation to calling a few co-workers; (g) BE&K Engineering ignored her request for mediation under the ESP for a year and a half; and (h) instead of thoroughly investigating her claims, BE&K Engineering reflexively branded her a vicious liar, demanded complete retraction of her allegations, rejected her request for a leave of absence, and fired her effective one day after she complained.  These facts leave considerable doubt that BE&K Engineering can establish *either* element of the *Faragher/Ellerth* defense by a preponderance of the evidence at trial.  It certainly has not proven both of them to the exclusion of any genuine issue of material fact on summary judgment.

-43-

because the record shows that she failed to complain to the company about Hudson's behavior until after she had "voluntarily ended her employment with BE&K Engineering." (BE&K Engineering Brief, at 29.) There are two gaping flaws in this argument. First, "protected activity" is not limited to formal complaints to the company; rather it also encompasses complaints made directly to the harasser/supervisor to cease harassing activities. After all, a supervisor's sexually harassing conduct is clearly a practice rendered unlawful by Title VII, and an employee's rejection of such activities is plainly a means of opposing such unlawful conduct. *See Little v. National Broadcasting Co.*, 210 F. Supp.2d 330, 386 (S.D.N.Y. 2002) (finding that rejecting a supervisor's sexual advances constitutes protected activity under Title VII); *Farrell v. Planters Lifesavers Co.*, 22 F. Supp.2d 372, 392 (D.N.J. 1998) ("rejection of sexual advances is a protected activity within the meaning [of] Title VII"); *Roberts v. County of Cook*, 2004 WL 1088230, *5 (N.D. Ill. May 12, 2004) ("The victim of harassment should not fear retaliation if she resists sexually predatory behavior by colleagues or supervisors."); *see generally Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001) ("[s]tatutorily protected expression includes internal complaints of sexual harassment to superiors").[65] Second, viewed in the light most favorable to McCulley, the record does not reflect that she voluntarily terminated her employment at BE&K Engineering at all. Rather, the evidence supports a reasonable inference that McCulley requested a leave of absence during the investigation of her allegations and that she intended to remain employed at the company, even after reporting the harassment. Unquestionably, McCulley has proffered ample evidence of protected activity to reach a

---

[65]     The Court recognizes that precedents on this point are not unanimous. *See, e.g., Rachel-Smith v. FTData, Inc.*, 247 F. Supp.2d 734, 748-49 (D. Md. 2003) (deeming plaintiff's act of telling supervisor to cease sexually harassing behavior not to constitute Title VII protected activity, where plaintiff never told supervisor she thought his advances were illegal and never reported them to third party). In the undersigned's view, the *Rachel-Smith* line of authority adopts an unduly narrow interpretation of Title VII, rather than construing the statute in accordance with its remedial purposes. Common sense dictates that a supervisor's sexual advances are unlawful under Title VII, that rebuffing such advances is one form of opposition to such unlawful conduct, and that the principles underlying Title VII would be offended if a plaintiff were fired for opposing unlawful harassment in that manner. Therefore, the better approach is to recognize that rejection of a supervisor's sexual advances constitutes protected activity for purposes of Title VII.

-44-

jury.

Defendant's next argument is that plaintiff's *prima facie* case fails because she "abandoned her work at BE&K Engineering and never suffered an adverse employment action." (Reply Brief, at 12.) The Court need not re-till this soil. Considered in the light most favorable to the plaintiff, the summary judgment record shows that she neither abandoned nor voluntarily quit her job, but rather that she was fired by the alleged harasser after she complained of harassment and requested a leave of absence pending investigation of such harassment. This showing is sufficient to enable plaintiff to withstand summary judgment on the question of her ability to establish a *prima facie* case of Title VII retaliation against BE&K Engineering.

Finally, BE&K Engineering indicates that summary judgment is appropriate on the retaliation claim because plaintiff cannot rebut its legitimate nonretaliatory reason for her dismissal, to-wit: McCulley's apparent abandonment of her job by cleaning out her office and failing to show up for work. Defendant is correct that a plaintiff's failure to show up for work is generally viewed as a legitimate, nondiscriminatory reason for termination. *See generally Gilchrist v. Bolger*, 733 F.2d 1551, 1553 (11th Cir. 1984). However, a number of facts in the record raise a genuine issue of material fact as to whether this stated reason for terminating McCulley's employment was pretextual. In particular, the Court finds the following facts, construed in the light most favorable to McCulley, sufficient to preclude the granting of summary judgment to defendant on this basis: (a) on the morning of June 6, 2002, plaintiff informed BE&K Engineering that she wanted a leave of absence while her allegations of extreme sexual harassment by her direct supervisor were investigated; (b) also on the morning of June 6, 2002, plaintiff's counsel asked BE&K Engineering to contact him to arrange the details of plaintiff's leave of absence; (c) BE&K Engineering ignored plaintiff's counsel's request; (d) eight days after plaintiff's June 6 letter, the company notified her counsel that it was rejecting her request for a paid leave of absence because "we cannot be expected to fund the litigation" (Plaintiff's Exh. 15); and (e) plaintiff's supervisor, the very person she had accused of sexual harassment, terminated her employment effective the day after she reported his allegations to the company. These facts suggest that BE&K Engineering knew that McCulley had not abandoned her job and that she

intended to return to work after the smoke cleared, but that the company nonetheless spurned any dialogue to facilitate her return to work and allowed the person she had accused of groping her and making highly offensive sexually charged comments to fire her immediately after she complained on grounds of abandonment. Such facts, if believed by a jury, would undermine BE&K Engineering's rationale that it fired plaintiff for abandoning her job and would expose that rationale as pretextual. Under the circumstances, any suggestion that there are no genuine issues of material fact as to the legitimacy of plaintiff's discharge is ludicrous. Summary judgment is **denied** on this point.

> ### E.   *Analysis of State Law Claims.*

Plaintiff's final causes of action, as set forth in her Sixth and Seventh Claims for Relief, are state law claims for assault and battery and negligent/wanton hiring, training or supervision. Plaintiff admits that BE&K Engineering is entitled to summary judgment on the negligence/ wantonness claim. (Opposition Brief, at 39.)[66]  Accordingly, BE&K Engineering's Motion for Summary Judgment is **granted** as to plaintiff's Sixth Claim for Relief.

With respect to the assault and battery claim, the Court finds that BE&K Engineering is entitled to summary judgment for two reasons. First, although not mentioned by defendant, a plain reading of the First Amended Complaint reflects that plaintiff is pursuing the Seventh Cause of Action against defendant Hudson only.[67]  Nothing in the First Amended Complaint could reasonably place BE&K Engineering on notice that plaintiff intended to bring an assault and battery claim against it; therefore, plaintiff is precluded by Rule 8(a)(2), Fed.R.Civ.P., from proceeding to a jury on that theory against

---

[66]    Again, while the Court appreciates McCulley's decision to spare the judicial resources necessary to determine the legal sufficiency of this cause of action as to this defendant, the Court questions why she did not concede the point at an earlier date. Indeed, plaintiff offers no explanation for why she could not have come forward sooner to withdraw a claim that she now admits is legally untenable. The parties' massive briefing efforts are rendered more convoluted and expensive by virtue of such belated tactical decision-making by plaintiff's counsel.

[67]    This impression is confirmed by the Rule 26(f) Report of Parties' Planning Meeting (doc. 38), in which plaintiff's narrative statement indicated that "Plaintiff alleges that Hudson assaulted and battered her," without manifesting any intent to hold any other defendant vicariously liable for such conduct. (*See* doc. 38, at 7.)

BE&K Engineering.

Second, the parties are in agreement that BE&K Engineering cannot be held vicariously liable under Alabama law for Hudson's alleged assault and battery of plaintiff absent a showing that Hudson was acting within the line and scope of his employment. *See Meyer v. Wal-Mart Stores, Inc.*, 813 So.2d 832, 834 (Ala. 2001) ("In order to recover against a defendant under the doctrine of *respondeat superior*, the plaintiff must establish the status of master and servant and that the act done was within the line and scope of the servant's employment."). Physical touchings of a subordinate's genital area, and vulgar comments regarding a subordinate's sexual practices and anatomy are simply not acts performed in the line and scope of a supervisor's duties, as a matter of law. *See Machen v. Childersburg Bancorporation, Inc.*, 761 So.2d 981, 985 (Ala. 1999) (supervisor's sexual comments and act of rubbing plaintiff's thighs were not committed in line and scope of employment, but were aimed merely at satisfying his own lustful desires); *Doe v. Swift*, 570 So.2d 1209, 1211 (Ala. 1990) (citing numerous cases "holding that sexual misconduct by an employee is purely personal and outside the line and scope of his employment" and rejecting decisions to the contrary from other jurisdictions); *Joyner v. AAA Cooper Transp.*, 477 So.2d 364, 365 (Ala. 1985) (trial court properly directed verdict for employer on assault and battery claims where plaintiffs claimed that supervisor had attempted to force them to engage in homosexual acts, given lack of evidence that supervisor's acts were within line and scope of employment or in furtherance of defendant's business); *see generally Walton*, 347 F.3d at 1284 (pointing out that "courts had uniformly rejected (either explicitly or implicitly) the notion that co-workers act within the scope of their employment when they harass fellow employees"). Against this formidable wall of precedent, plaintiff does not point to any evidence suggesting any basis for deviating from these principles here. Instead, she asserts in conclusory terms that a jury question exists as to Hudson's motives in allegedly assaulting and battering her with unwanted sexual contact, inasmuch as he may not have been motivated wholly by personal motives. As this opaque reasoning runs counter to the foregoing authorities as well as a common-sense application of the "line and scope of employment" standard to sexual harassment cases, the Court will not embrace it here.

For the foregoing reasons, the Court finds that BE&K Engineering is entitled to judgment in its favor as a matter of law on the assault and battery cause of action.  Accordingly, BE&K Engineering's Motion for Summary Judgment is **granted** as to plaintiff's Seventh Claim for Relief.

## V.    The BE&K, Inc. Motion for Summary Judgment.

The Court now turns to the Motion for Summary Judgment (doc. 97) filed by defendant BE&K, Inc., the parent company of defendants ViaTech, Allstates and BE&K Engineering.  As an initial matter, the Court notes that BE&K, Inc. has adopted and incorporated the summary judgment motions of the subsidiary defendants in their entirety.  (BE&K, Inc. Brief (doc. 98), at 5.)  To the extent that BE&K, Inc.'s Rule 56 Motion is redundant of those filed by the other defendants, it is resolved in exactly the manner set forth in Sections III and IV, *supra*.

There are, however, two unique bases for summary judgment championed by BE&K, Inc.  First, defendant maintains that McCulley's Title VII claims are barred as to it for failure to exhaust administrative remedies.  Second, BE&K, Inc. asserts that even if the exhaustion requirement is satisfied, summary judgment is warranted because it was not McCulley's "employer" and therefore cannot be liable to her under Title VII, as a matter of law.  The Court will address each of these defenses in turn.

### A.    *Exhaustion of Remedies as to Title VII Claims.*

A potential plaintiff may not file suit under Title VII unless he first exhausts administrative remedies by filing a timely charge of discrimination with the EEOC.  *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001).  The uncontroverted evidence is that plaintiff's Amended Charge of Discrimination filed with the EEOC on August 7, 2002 named as respondents ViaTech, Allstates, and BE&K Engineering, but not BE&K, Inc.  (First Amended Complaint, at Exh. 4.)  In light of this omission, BE&K, Inc. contends that it is due summary judgment on the Title VII claims because plaintiff failed to exhaust her administrative remedies against it.

The Eleventh Circuit has recognized the well-worn principle that "[o]rdinarily, a party not named in the EEOC charge cannot be sued in a subsequent civil action."  *Virgo v. Riviera Beach Associates, Ltd.*, 30 F.3d 1350, 1358 (11th Cir. 1994).  The *Virgo* court explained the justifications

for this rule as being twofold: (1) "to notify the charged party of the allegations" and (2) to "allow[] the party an opportunity to participate in conciliation and voluntarily comply with the requirements of Title VII." *Id.* That said, the naming requirement is construed "liberally," such that a party unnamed in the EEOC charge may properly be sued so long as the purposes of Title VII are fulfilled. *Id.* at 1358-59; *see also Whitson v. Staff Acquisition, Inc.*, 41 F. Supp.2d 1294, 1299 (M.D. Ala. 1999) (remarking that "hypertechnical compliance" with Title VII's filing requirements is not necessary); *Scelta v. Delicatessen Support Services, Inc.*, 57 F. Supp.2d 1327, 1353-54 (M.D. Fla. 1999) (explaining that naming requirement is not intended as "stumbling block" to fulfillment of Title VII's statutory objectives).

To assess whether a party unnamed in the EEOC charge may be subjected to the jurisdiction of a federal court, courts in this circuit eschew rigid tests, but instead consider a constellation of factors including the following: (i) similarity of interest between named and unnamed parties; (ii) whether plaintiff could have ascertained the unnamed party's identity at the time of the EEOC filing; (iii) whether the unnamed party received adequate notice of the EEOC charge; (iv) whether the unnamed party had adequate opportunity to participate in the EEOC conciliation process; and (v) whether the unnamed party will be actually prejudiced by exclusion from the EEOC proceedings. *See Virgo*, 30 F.3d at 1359; *Gordon v. MCG Health, Inc.*, 301 F. Supp.2d 1333, 1338 (S.D. Ga. 2003); *Scelta*, 57 F. Supp.2d at 1354; *Whitson*, 41 F. Supp.2d at 1299.

Unfortunately, neither side's briefing identifies the *Virgo* line of precedent on this issue, much less recognizes its controlling status.[68] Nor do the parties apply the multi-factor test forged by *Virgo* and its progeny to ascertain whether allowing McCulley to sue BE&K, Inc. -- even though she never named it as a respondent in her EEOC charge -- would advance the purposes of Title VII.

---

[68] These omissions are particularly peculiar because both sides cite *Virgo* in support of their respective positions about whether BE&K, Inc. qualifies as plaintiff's "employer" for Title VII purposes. Rather than reciting and applying the *Virgo* test for Title VII jurisdiction over a defendant not named in the EEOC charge, the parties' briefing on that point bogs down in an unhelpful semantic discussion about the frequency and significance of plaintiff's use of the ambiguous term "BE&K" in her charge. (Opposition Brief, at 29; Reply Brief, at 8.) This argument is a non-starter given the guidance furnished by the Eleventh Circuit in *Virgo*.

Nonetheless, the Court concludes that the balance of the *Virgo* factors tips heavily in favor of allowing McCulley to proceed with her Title VII claims against BE&K, Inc.  The record contains no evidence that there is anything other than identity of interest between BE&K, Inc. and BE&K Engineering in this matter.  BE&K, Inc. has never suggested that it lacked notice of McCulley's charge, nor could it credibly do so given that the corporate actors handling the charge on BE&K Engineering's behalf were also affiliated with BE&K, Inc.  Likewise, the record is devoid of any suggestion that BE&K, Inc. was unable to participate in the EEOC conciliation process, or that it was in any way prejudiced by its omission from the charge.  Rather, the evidence supports a finding that BE&K, Inc. was well aware of McCulley's charge, that its legal representative actually participated in the EEOC conciliation/mediation process,[69] and that BE&K, Inc. was in no way prejudiced by its exclusion from the charge.  Therefore, on the record before it, and in light of the Eleventh Circuit's liberal construction of the naming requirement, the Court readily concludes that McCulley's failure to name BE&K, Inc. as a respondent in her EEOC charge does not impede her ability to pursue Title VII causes of action against it in these proceedings.[70]  BE&K, Inc.'s request for summary judgment on that basis is **denied**.

---

[69]     On this point, BE&K, Inc. insists, with no corroboration or explanation, that in-house counsel Nicholas Bouler "represented Allstates and BE&K Engineering with regard to the EEOC charge, responses, and conciliation/mediation, not BE&K, Inc."  (Reply Brief (doc. 117), at 8.)  But BE&K, Inc. offers no inkling of how Bouler can possibly wear one "hat" to the exclusion of all others, much less any basis for concluding that Bouler was not acting in furtherance of BE&K, Inc.'s interests at all times relevant to the EEOC charge, particularly given his apparent status as an employee of BE&K, Inc.

[70]     *See Virgo*, 30 F.3d at 1359 (finding no error where district court allowed Title VII claims to proceed against parties not named in EEOC proceeding, where they were functionally identical to named entities, had actual contemporaneous notice of the EEOC charges, and had an opportunity to participate in conciliation process, thus satisfying purposes of Title VII); *Gordon*, 301 F. Supp.2d at 1338-39 (allowing Title VII claims against entity not named in EEOC charge, where unnamed entity was "closely related" to named respondent, had notice of charges and opportunity to participate in reconciliation, and there was no evidence of prejudice, even though plaintiff could have ascertained unnamed entity's identity prior to filing charge); *Scelta*, 57 F. Supp.2d at 1354-55 (finding that movant was subject to federal court jurisdiction, despite not being named in EEOC charge, where there was identity of interest with defendant named in charge, movant had received adequate notice of charge, movant had opportunity to participate in reconciliation process, and movant had not been

**B.** **Application of "Integrated Employer" Theory.**

It is axiomatic that a defendant may not be sued under Title VII on a sexual harassment theory unless that entity qualifies as an "employer" within the meaning of Title VII. *See, e.g., Virgo*, 30 F.3d at 1359; 42 U.S.C. § 2000e(f) (defining "employee" as "an individual employed by an employer"); *Scelta*, 57 F. Supp.2d at 1344 (observing that "to recover under Title VII a plaintiff must prove that an 'employer' discriminated against him/her" because of protected class status). Simply put, if BE&K, Inc. is not McCulley's "employer," then it is not covered by Title VII and cannot be liable to McCulley on any of her Title VII claims. On this basis, BE&K, Inc. seeks summary judgment on the Title VII causes of action.

The parties agree that throughout the time period that McCulley was nominally employed by ViaTech and BE&K Engineering, those entities were wholly-owned subsidiaries of BE&K, Inc. Where they part company, however, is on the question of whether BE&K, Inc.'s relationship with ViaTech and BE&K Engineering is sufficient to expose it to liability under Title VII. The Court must apply the "integrated employer" test to resolve this issue.

1. *Four-Part "Integrated Employer" Test.*

The law of this circuit is that, "[w]here two or more corporations, such as a parent and a subsidiary, are 'highly integrated with respect to ownership and operations,' the corporations may be viewed as a 'single employer' for purposes of establishing Title VII liability. ... If the parent corporation is found to be the 'employer,' it can be held liable for the acts of the subsidiary." *Thornton v. Mercantile Stores Co.*, 13 F. Supp.2d 1282, 1291 (M.D. Ala. 1998) (citations omitted). To determine whether two businesses constitute a "single employer" (otherwise called an "integrated enterprise") for Title VII purposes, courts consider the following four factors: (1) the degree of interrelatedness of operations between the two entities; (2) the degree of centralized control of labor relations; (3) presence of common management; and (4) common ownership or financial control. *See Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1341 (11th Cir. 1999); *McKenzie v.*

---

prejudiced by exclusion from EEOC proceedings).

*Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987).[71]  In considering these criteria, courts must bear in mind the liberal construction afforded the term "employer" under Title VII. *See Lyes*, 166 F.3d at 1341 ("We accord a liberal construction to the term 'employer' under Title VII."); *Virgo*, 30 F.3d at 1359 ("Consistent with the purposes of the Act we interpret the term 'employer' liberally.").

 While all four factors are weighed in the "single employer" calculus, primacy is afforded to that of centralized control of labor relations.  *See Thornton*, 13 F. Supp.2d at 1291; *see also Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1244-45 (11th Cir. 1998) (explaining that "single employer" test concentrates on degree of control an entity has over adverse employment decision on which Title VII suit is based); *Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761, 764 (5th Cir. 1997) ("single employer" analysis may be refined to single question, "What entity made the final decisions regarding employment matters related to the person claiming discrimination?").  Nonetheless, as defendant urges, "the fact that one factor in the integrated enterprise test weighs in favor of a finding of interrelation is not dispositive."  (Reply Brief, at 6.)  To the contrary, "[a] plaintiff need not show that each factor exists in order to establish an integrated enterprise, nor is there one factor a plaintiff must show" in order to prevail on this issue.  *Meng v. Ipanema Shoe Corp.*, 73 F. Supp.2d 392, 402 (S.D.N.Y. 1999) (citation omitted).

---

[71] Although the Eleventh Circuit cases cited are not in the parent/subsidiary context, the principles espoused therein have been echoed by other circuits addressing a parent's liability under Title VII for the acts of a subsidiary.  *See, e.g., Garcia v. Elf Atochem North America*, 28 F.3d 446, 450 (5th Cir. 1994) ("a parent and subsidiary cannot be found to represent a single, integrated enterprise in the absence of evidence of (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control."); *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993) (adopting four-factor "integrated enterprise" test to determine whether parent was liable for discrimination by subsidiary); *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995) (allowing Title VII action against parent company to proceed where subsidiary that employed plaintiff was wholly owned by parent; parent ran subsidiary in a direct, hands-on fashion, establishing subsidiary's management and operating practices; parent controlled subsidiary's labor relations by approving its personnel decisions, personnel status reports, etc.; and common management structure existed because subsidiary's president worked out of parent's corporate offices).

2.    *Interrelation of Operations.*

McCulley points to considerable evidence that the operations of BE&K, Inc. are heavily intertwined with those of ViaTech and BE&K Engineering (the "Subsidiaries").  In particular, plaintiff's evidence reveals the following operational interrelationships, among others, between the two entities: (a) BE&K, Inc. exercises control over the Subsidiaries' banking operations, as evidenced by the facts that all three companies employ the same Treasurer, BE&K, Inc. files a consolidated tax return for the Subsidiaries, and BE&K, Inc. handles the Subsidiaries' banking operations, bookkeeping functions, payroll services, bill-paying services, insurance payment services, and the like; (b) the Subsidiaries are signatories on BE&K, Inc.'s credit obligations; (c) the Subsidiaries must submit annual proposed operating budgets to BE&K, Inc. for approval; (d) BE&K, Inc. provides legal services to the Subsidiaries; (e) both managerial and rank-and-file employees routinely transfer between BE&K, Inc. and the Subsidiaries (and sometimes hopscotch back again) with no break in benefits or service credit; (f) BE&K, Inc. manages the Subsidiaries' benefits plans; and (g) BE&K, Inc. shares office space with one or more of its Subsidiaries.  (Plaintiff Brief (doc. 111), at 4-22.)[72]

This evidence, none of which is contested by BE&K, Inc., constitutes a substantial showing of "interrelated operations" between BE&K, Inc. and its Subsidiaries under any reasonable construction of the term.  *See Thornton*, 13 F. Supp.2d at 1291-92 (finding interrelatedness where parent handled subsidiary's banking operations, paid subsidiary's vendor obligations, retained control over subsidiary's operating budget, provided payroll and legal services to subsidiary, allowed employees to transfer between parent and subsidiary, managed subsidiary's benefit plans, and the like); *see also Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993) (type of evidence used to show interrelatedness includes commonality of employees and headquarters, sharing of office space, control of payroll and

---

[72]    Faced with this extensive showing of interrelatedness, BE&K, Inc. concedes (as it must) that "there is some interrelation" between the companies in relevant areas, but argues that the services it provides to the Subsidiaries should be discounted as proof of interrelatedness.  (BE&K, Inc. Reply Brief, at 5.)  Defendant's admission of interrelatedness effectively acknowledges the existence of genuine issues of material fact on this point.  Besides, on this record, a reasonable factfinder could conclude that BE&K, Inc.'s involvement in its Subsidiaries' operations went far beyond simply providing services that the Subsidiaries otherwise would have had to contract out to third parties.

benefit programs, and maintenance of corporate books); *McKenzie*, 834 F.2d at 933-34 (interrelatedness prong satisfied where parent maintained books and records of subsidiary, issued payroll checks for subsidiary, prepared checks for subsidiary, paid subsidiary's bills, etc.). Therefore, the Court readily concludes that this factor supports BE&K, Inc.'s "employer" status for purposes of plaintiff's Title VII claims.

###### 3.	Centralized Control of Labor Relations.

BE&K, Inc. asks the Court to find that there are no genuine issues of material fact as to whether it exerts centralized control over the Subsidiaries' labor relations functions. In applying this factor, defendant indicates that the critical considerations are "(1) the maintenance of separate human resources departments; (2) the extent to which the subsidiaries make their own hiring, firing, and supervision decisions; and (3) whether the parent corporation and the subsidiaries shift their employees back-and-forth." (Reply Brief, at 3 (citing *Meng*, 73 F. Supp.2d at 403.) Assuming the correctness of defendant's statement of the crucial facts to examine in ascertaining whether centralized control of labor relations exists, the record reflects ample basis for an adverse determination to BE&K, Inc. on each of these points.

First, the record shows that BE&K, Inc. and the Subsidiaries do not maintain separate human resources departments, but that BE&K, Inc. oversees the human resources function for all of the BE&K companies. It does not appear that either Subsidiary has its own human resources office. Furthermore, BE&K Engineering adopted BE&K, Inc.'s employee handbook wholesale, without making a single change; meanwhile, ViaTech admits that the bulk of its employee handbook was copied from the BE&K, Inc. handbook and that all changes were subject to review and approval by BE&K, Inc. The Subsidiaries follow the Employee Solution Program of BE&K, Inc., which is implemented and administered by BE&K, Inc. (Plaintiff's Brief, at 23-25.) Clearly, the centralized human resources functions among the three companies militate in favor of a finding of centralized control of labor relations.

Second, there is certainly room for doubt as to whether the Subsidiaries actually make their own hiring, firing and supervision decisions. This point may be illustrated by examining McCulley's

circumstances.  Although his testimony was disputed, defendant Hudson testified that he did not have authority to fire McCulley and that he was directed by BE&K, Inc.'s in-house counsel, Nicholas Bouler, to terminate her employment.  (Hudson Dep., at 100, 102, 144-45.)  According to Hudson, he couldn't fire his BE&K Engineering subordinates even if he wanted to; rather, those decisions had to come from BE&K, Inc.  Taken in the light most favorable to plaintiff, this evidence establishes that BE&K, Inc. possessed and exercised control over termination decisions at the Subsidiaries, including specifically the termination decision at the heart of McCulley's Title VII retaliation claims.  Such evidence is unquestionably sufficient to create a genuine issue of material fact as to whether the Subsidiaries had sole control over major personnel decisions, and therefore whether BE&K, Inc. had centralized control of their labor relations.  *See Frank*, 3 F.3d at 1363 (explaining that critical question for control of labor relations factor is "what entity made the final decisions regarding employment matters related to the person claiming discrimination?"); *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1241 (2ⁿᵈ Cir. 1995) (stressing that "total control or ultimate authority" over all personnel decisions is not necessary to satisfy four-factor test); *Thornton*, 13 F. Supp.2d at 1293-94 (parent company's authority or power to control decisions at issue is highly important in "integrated enterprise" test, even if such authority was not exercised); *compare Cruz-Lovo v. Ryder System, Inc.*, 298 F. Supp.2d 1248, 1254 (S.D. Fla. 2003) (centralized control of labor relations factor not satisfied where company had sole authority to hire, fire and supervise its own employees).

Third, there is abundant evidence that BE&K, Inc. and the Subsidiaries shift employees back and forth.  In particular, plaintiff has offered detailed evidence of three different BE&K managers who have transferred (often multiple times) between Subsidiaries or between BE&K, Inc. and its Subsidiaries at various times.  A BE&K, Inc. representative testified that the list of employees who transferred between BE&K, Inc. and its subsidiaries during the 2-year period of McCulley's employment at BE&K entities could number into the hundreds of employees.  (Smith Dep., at 21.)  Plaintiff herself transferred from one BE&K, Inc. Subsidiary to another, at the behest of BE&K, Inc.'s in-house attorney.  This free movement of employees among different entities under the BE&K aegis plainly favors a finding of an integrated enterprise.

On this showing, the Court cannot concur with defendant's position that the centralized control of labor relations element clearly weighs against a finding of interrelatedness; rather, the converse is true, at least for summary judgment purposes.

        *4.     Common Management.*

The "common management" factor generally turns on whether there are common directors and officers for both the parent corporation and the subsidiaries. *See McKenzie*, 834 F.2d at 933 (pointing out existence of common managers in both companies); *Thornton*, 13 F. Supp.2d at 1294 (common management factor satisfied when senior officials of parent company also held senior management positions within subsidiary). Here, McCulley comes forward with evidence of no fewer than seven persons who held director, officer or key managerial positions for BE&K, Inc. and who also held similar positions for the Subsidiaries. (Plaintiff's Brief, at 25-28.) For example, during times relevant to this lawsuit, all three companies shared the same Treasurer, Doug Joehl; the same in-house legal counsel, Bouler; and the same Vice President and Secretary, G. Edward Cassady, III. The President of BE&K, Inc. was also on the Board of Directors for BE&K Engineering, while the President of BE&K Engineering also served on the Board of Directors for BE&K, Inc. (*Id.*) Given such extensive overlap and interrelation of officers, directors and other key managers among the three companies, a reasonable factfinder could easily find that the management structure of BE&K, Inc. and its Subsidiaries was sufficiently intertwined, enmeshed and entangled to satisfy the "common management" requirement.[73]

        *5.     Common Ownership.*

The evidence is undisputed that BE&K Engineering and ViaTech are wholly owned subsidiaries of BE&K, Inc. Nothing further is required to establish the "common ownership" prong of the "integrated enterprise" test. *See Frank*, 3 F.3d at 1364 (deeming common ownership factor satisfied simply because parent is sole shareholder of subsidiary); *Thornton*, 13 F. Supp.2d at 1294 (similar).

---

[73]     In response, defendant begrudgingly admits that "some of the officers and/or directors of the Subsidiaries were also officers and/or directors of BE&K, Inc." (Reply Brief, at 6.) To make such an admission is to acknowledge the existence of genuine issues of material fact on this point.

Defendant's decidedly perplexing rejoinder to the unchallenged fact of the common ownership between the two companies is to nonetheless insist that the common ownership element "weighs against a finding of interrelationship here."  (Reply Brief, at 7.)  BE&K, Inc. accuses McCulley of somehow failing "to fulfill her burden" as to the common ownership criterion in some unspecified way, because plaintiff has offered "no further support" for that factor except to show the undisputed fact that BE&K, Inc. and the Subsidiaries are, in fact, commonly owned.  (*Id.*)  This argument fails on its face, and need not detain the Court.[74]

> 6. *Conclusion.*

As the foregoing analysis demonstrates, all four factors of the "integrated employer" test weigh heavily in favor of allowing plaintiff's Title VII claims against BE&K, Inc. to continue, inasmuch as there are genuine issues of material fact as to whether BE&K, Inc. and the Subsidiaries may properly be characterized as a "single employer" for Title VII purposes.  As such, BE&K, Inc.'s Motion for Summary Judgment is **denied** as to the Title VII causes of action.  *See Cook*, 69 F.3d at 1241 (finding that parent company is not entitled to summary judgment where there was sufficient evidence as to all four factors of the "integrated employer" standard to allow case to continue against parent); *McKenzie*, 834 F.2d at 933-34 (reversing grant of summary judgment in defendant's favor on "single employer" issue where genuine issues of fact remained as to the four NLRB factors); *Thornton*, 13 F. Supp.2d at 1294-95 (construing "employer" liberally, and applying all four *McKenzie* factors, to find genuine issues

---

[74]     The authority on which defendant relies does not hold that something more than proof of common ownership is required to satisfy the common ownership factor.  Rather, the cited authorities simply state the unremarkable proposition that proof of common ownership is not, in and of itself, dispositive of the entire four-factor "integrated employer" test.  *See Cruz-Lovo*, 298 F. Supp.2d at 1254 (opining that while plaintiff had made "some showing of common ownership" by virtue of proof that credit union was owned, in part, by defendant's employees, that showing did not prove by itself that credit union and defendant were integrated employers, in light of other factors).  The Court cannot discern whether defense counsel have confused themselves as to the appropriate standard, or whether they are simply proceeding with a "slash-and-burn," obstructionist strategy of objecting to everything.  Either way, for BE&K, Inc. to argue that, notwithstanding the unmistakable fact that it owns 100% of the Subsidiaries, the "common ownership" factor militates in favor of a ruling that there is no integrated enterprise here is to waste their time, as well as that of the Court, on frivolous contentions that are manifestly unsupportable.

of material fact as to whether parent and subsidiary were "single employer" under Title VII, thus precluding summary judgment).

      *C.*      ***State Law Claims.***

      BE&K, Inc. also seeks Rule 56 relief as to plaintiff's state-law claims against it for negligence, wantonness, and assault and battery.  In response, plaintiff states that while she "does not agree with BE&K Inc.'s position, Plaintiff consents to the dismissal of her Sixth and Seventh claims against BE&K Inc." (Opposition Brief (doc. 111), at 1 n.1.)  The reasons for plaintiff's capitulation are unclear. Nonetheless, given that plaintiff has expressly agreed to dismissal of her state law claims against BE&K, Inc., summary judgment will be **granted** in BE&K, Inc.'s favor as to the Sixth and Seventh Claims for Relief.

**VI.**     **Conclusion.**

      For all of the foregoing reasons, defendants' Motions for Summary Judgment (docs. 93, 95, 97) are **granted in part and denied in part**.  The Motion for Summary Judgment (doc. 93) filed by defendants ViaTech and Allstates is **granted** with respect to the First, Second, Third, Fourth, Sixth and Seventh Claims for Relief.  As to the Fifth Claim for Relief, the Motion is **granted** insofar as plaintiff seeks recovery for alleged micromanagement or failure to provide a performance evaluation, but is **denied** in all other respects.  Defendant BE&K Engineering's Motion for Summary Judgment (doc. 95) is **granted** as to plaintiff's Sixth and Seventh Claims for Relief, but is **denied** in all other respects. Defendant BE&K, Inc.'s Motion for Summary Judgment (doc. 97) is **granted** as to the Sixth and Seventh Claims for Relief, and as to those aspects of the Fifth Claim for Relief as to which ViaTech/Allstates were awarded summary judgment, but is **denied** in all other respects.

      DONE and ORDERED this 21st day of June, 2005.

                                      s/ WILLIAM H. STEELE
                                      UNITED STATES DISTRICT JUDGE